(119 App. Div. 153)

## PEOPLE v. HUMMEL.

(Supreme Court, Appellate Division, First Department. May 10, 1907.)

**1. CRIMINAL LAW—ACCOMPLICE—CORROBORATION—INSTRUCTIONS.**

Where there was evidence corroborating an accomplice testifying for the people, it was not error to instruct that as a matter of law there was evidence tending to corroborate him if the jury believed it to be true; the court instructing thoroughly on what might be regarded as corroborative testimony and the necessity of proof of his guilt beyond a reasonable doubt.

· [Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 1731, 1748.]

**2. SAME.**

In a trial for an attorney's participation in a conspiracy, it appeared that defendant at the instance of one who had no relation to a divorce action, induced one against whom a divorce had been granted, to go to New York, had him make a false affidavit that he was never served with summons, and had not authorized an attorney to appear for him, which defendant used in obtaining an order vacating the divorce decree. *Held,* that it was proper to refuse to instruct that the crucial point was whether the husband told defendant that he had been served with process and had

authorized an attorney to appear, and, unless the husband's statement that he had was corroborated, defendant must be acquitted; the corroboration necessary being as to defendant's connection with the crime.

3. SAME—EFFECT OF WITNESSES' REFUSAL TO TESTIFY.

In a trial for conspiracy, it was proper to refuse to instruct that the fact that witnesses called by the people who were connected with defendant in business, declined to testify on the ground that their answers might tend to incriminate them, created no presumption against "them."

4. SAME—EFFECT OF DEFENDANT'S FAILURE TO OFFER EVIDENCE.

In a criminal trial, it was not error to refuse to charge that the determination of the defendant to introduce no evidence created no presumption against him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1902.]

Appeal from Trial Term, New York County.

Abraham H. Hummel was convicted for conspiracy, and he appeals. Affirmed.

See 98 N. Y. Supp. 713.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, CLARKE, and SCOTT, JJ.

John B. Stanchfield, for appellant.

Robert C. Taylor, for respondent.

INGRAHAM, J. This defendant was indicted for conspiracy under section 168 of the Penal Code, which provides that:

"If two or more persons conspire, either (1) To commit a crime; Or * * * (6) To commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the laws; each of them is guilty of a misdemeanor."

The indictment charges this appellant, Charles F. Dodge and Benjamin Steinhardt with conspiring to illegally, falsely, and fraudulently procure and obtain an order in the Supreme Court, vacating and setting aside a certain judgment and decree of divorce, by falsely and fraudulently representing to the court that the summons in the said action had never been served on said Charles F. Dodge, the defendant in that action, and that one Ruger, an attorney at law, who had appeared for the defendant therein, had never been requested, directed, or authorized by the said Charles F. Dodge to appear for him. There were four counts in the indictment, all charging substantially the same offense. The appellant, Hummel, was convicted, and he appeals from the judgment entered thereon.

In determining this appeal, we are to keep in mind the provision of section 542 of the Code of Criminal Procedure, that:

"After hearing the appeal, the court must give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties."

Dodge, who was joined with Hummel in the indictment, was a witness for the people upon the trial. The defendant claims, and it is conceded that in whatever was done Dodge and the defendant were accomplices, and that no conviction can be sustained upon Dodge's testimony "unless he be corroborated by such other evidence as tends

to connect the defendant with the commission of the crime." Section 399, Code Cr. Proc. Upon this appeal the defendant insists that the testimony of Dodge was not corroborated so as to justify the jury in rendering a verdict of guilty. I think it will tend to clarify the discussion of this question to state as shortly as possible the facts which were proved by uncontradicted testimony, excluding that given by the accomplice Dodge.

It seems that on the 28th of March, 1877, Charles F. Dodge and Clemence Dodge were married in San Francisco, and subsequently became residents of this state; that in the year 1897, Clemence Dodge commenced an action in the Supreme Court of this state for an absolute divorce against Charles F. Dodge, which action resulted in a judgment of divorce which was entered on the 21st day of June, 1898. After the divorce was granted the plaintiff, Mrs. Dodge, continued to reside in this state. No question had ever been raised as to the validity of the decree, and, so far as appears, both parties to it recognized it as a valid divorce. In June, 1901, Mrs. Charles F. Dodge was married to Mr. Charles W. Morse, a gentleman who had resided in this state for 10 years. Mr. Morse was a widower; his first wife having died in 1897 or 1898, and had four children living. The judgment of divorce was treated by all of the parties to it and those connected with them as a valid divorce. Mr. and Mrs. Morse had acted upon that assumption, and, so far as appears, in good faith had contracted this second marriage, and were living together in this state as man and wife. Mr. Charles W. Morse had an uncle, Mr. James T. Morse, who lived in Boston. He was a retired sea captain, treasurer of the Eastern Steamship Company and the Metropolitan Steamship Company, and largely interested in corporations. In the summer of 1903, Mr. James T. Morse came to New York and called on the defendant, Hummel, who was a member of the bar, practicing in the city of New York. Mr. James T. Morse told Hummel that his nephew Charles W. Morse had married a lady named Mrs. Dodge in the year 1901; that his family was much dissatisfied with it, as she was taking him away from his sister and children by his first marriage; that he (Mr. J. T. Morse) had heard rumors that the divorce that had made Mrs. Dodge a free woman was irregular; that Mr. Dodge was then somewhere in the South and that he (James T. Morse) would like to have Mr. Hummel look up the case. He then gave Hummel his telephone number in Boston, and Hummel stated that he would look up the divorce and report about it. After this interview, and about the end of August, 1903, the defendant examined the judgment roll in the action of Dodge v. Dodge. Subsequently the defendant called Mr. James T. Morse on the telephone at Boston, and told him that he had looked up the records in Dodge v. Dodge and had found them very irregular and bad, and asked James T. Morse to come to New York, and that he (Hummel) wanted him to bring a retainer of $15,000. James T. Morse got $15,000 in bills, brought it to New York, and gave it to Hummel, who told him that the divorce in the case of Dodge v. Dodge was not legal and regular, and that Charles W. Morse's second marriage could be upset. Hummel was then instructed by James T. Morse to upset the marriage if he could, but not to let it be known that he

(James T. Morse) had anything to do with the matter. Hummel then told James T. Morse that he was going to work on the case.

It thus appeared that it was not at the instigation of either of the parties to the divorce action that the subsequent proceedings were instituted. Mrs. Dodge did not want to interfere with the divorce; and so far as appears, Dodge, who had lived over five years since it was granted without showing any inclination to object to its validity, was satisfied with it. The only one who was dissatisfied would appear to be the uncle of Charles W. Morse, and he had instructed Hummel to break up the marriage of his nephew by attacking the judgment of divorce, and he had paid $15,000 as a fee to accomplish that result. It was apparent that the only persons who could make any objection to the regularity of the decree of divorce was Mrs. Morse or Dodge. It was evidently useless to apply to Mrs. Morse, so, in order to accomplish anything, it was necessary that Hummel should in some way get hold of Dodge and use him to accomplish this result. This it would appear he proceeded to do. Hummel had been informed that Dodge was living somewhere in the South; and, on the 8th of September, 1903, Dodge was in New York in communication with Hummel, and on that day made an affidavit before a notary employed in Hummel's office. In that affidavit Dodge stated that he had been married to his wife in March 1877, and that they had lived together as husband and wife for 11 or 12 years at various places, one of which was New York City; that they had differences and finally separated, and had lived apart in the City of New York; that in 1893 Dodge went to Atlanta, Ga., and carried on business there as manager of a hotel; that in 1895 his wife came to Atlanta and remained there four or five days, when she returned to New York; that in 1896 or 1897 a lawyer in Atlanta called upon him and asked him to furnish evidence by which Mrs. Dodge could get a divorce, and with that request he complied, upon condition that Mrs. Dodge would ask for no alimony; that subsequently this lawyer informed Dodge that Mrs. Dodge's lawyer had secured a lawyer for Dodge in New York, who would put in a defense so that the case might be sent before a referee and tried quietly, and that the entire business would not cost Dodge a cent; that he had never seen a Mr. Ruger, who, it was said, appeared for him; that he had never been served with the summons or complaint in the divorce action, and knew nothing about what was going on in reference to it; that he had returned to New York in the summer of 1898 and spent that summer at the Long Beach Hotel on Long Island; that the first information he had that his wife had secured a divorce was from an article in the New York Sun, and that subsequently a certified copy of the decree was mailed to him at the Long Beach Hotel in the summer of 1898. From the testimony taken before the referee upon which the decree was granted, it appeared that plaintiff's attorney was called as a witness, and testified that on March 31, 1897, he served the summons without the complaint on Charles F. Dodge at the Everett Hotel in the city of New York; that he had conversation with Dodge in which he admitted that he was the husband of the plaintiff and accepted the summons. The evidence justified the finding of the referee and the judgment, and it was clear that the only method by which this

judgment could be attacked was to prove that Dodge was a nonresident; that he had never been served with the summons, and that he had not authorized an appearance in the action.

After Hummel had obtained this affidavit from Dodge, and on the 10th of September, he wrote a letter to Mr. Charles W. Morse, a copy of which is annexed to an affidavit subsequently made by Hummel. Hummel had been employed by James T. Morse to upset the marriage of Charles W. Morse to Mrs. Dodge, and had received a fee of $15,000 to accomplish that result. Assumedly this was in opposition to the desire of Charles W. Morse, whose marital relations would be disturbed if this divorce judgment was declared invalid. If Hummel was in good faith carrying out the instructions he had received from James T. Morse, the reason of his writing to Charles W. Morse to call his attention to what he claimed to be an irregularity in this decree of divorce is not apparent. The letter stated that: "Mr. Dodge, whose interests I represent," had made an affidavit, the substance of which is recited in the letter. The criticism of Hummel as to this divorce judgment was then stated, and the letter continued:

"It is my duty to advise you that this decree is collusive and irregular, and it may be doubted whether your subsequent marriage is a lawful one."

That Mr. Dodge could have the judgment set aside and that Mr. C. W. Morse's subsequent marriage to his wife was an alienation of her affections and that her conduct in becoming his wife entitled him to a decree against her for adultery with Morse. That he (Hummel) had taken the liberty of thoroughly informing Mr. Morse regarding this matter, so, if he desired, he could at once confer with his counsel before any legal steps were taken. This letter is suggestive. The defendant had obtained $15,000 from James T. Morse to upset the decree. Mr. Charles W. Morse, who had married Mrs. Dodge, was a gentleman of wealth and position, and naturally would most seriously object to any scandal of this kind concerning his wife being made public, and, under these circumstances, what the defendant had in view can be readily surmised. The result of the communication, however, must have been a disappointment to the defendant, for Charles W. Morse at once called upon him, and told him that this was a matter about which there could be no compromise in any way; that, if his wife's divorce was not legal, steps would have to be taken to dissolve the marriage and make it legal; and that no compromise could be made in any way. In reply, Hummel said that his client (Mr. Dodge) wanted the divorce set aside and that he would not compromise the matter in any way. Mr. Charles W. Morse subsequently procured an interview between Hummel and Sweetser, who had been attorney for Mrs. Dodge in the action for divorce. Sweetser claimed that the divorce was entirely legal, and Hummel claimed that it was corrupt and bad in every particular. Hummel said that:

"Mr. Dodge had taken this matter up since the death of his mother; that he felt that he had been imposed upon in the matter, and wanted it set right."

The object of this communication to Charles W. Morse not having been attained, Hummel then proceeded to attack the Dodge divorce. He made a motion in the name of Dodge to set aside the judg-

ment, upon the ground that Dodge had never been served with the summons in the action and had never authorized an attorney to appear for him.   In Dodge's original affidavit, sworn to on the 8th of September, it was stated that a copy of the decree in 1898 had been served upon Dodge in the state of New York, and that Dodge, who was then living in New York, had allowed five years and upwards to pass without objecting in any way to the decree, and it might be quite possible that, notwithstanding the effect that the death of his mother had had upon him to induce him to endeavor to set the judgment aside, a court might take the view that laches would stand in the way of having a judgment set aside which was valid upon its face, which the parties had acted upon for so long, and upon the faith of which other relations had been entered into.   So, instead of using the affidavit of September 8, 1903, the defendant procured another affidavit from Dodge upon which the motion was made.   This second affidavit was sworn to on the 19th of October, 1903, and in it Dodge swore that he never, directly or indirectly, retained Ruger as his lawyer in the action; never signed any paper in the suit; and never authorized him to appear in the action or interpose an answer:   "Nor was I at any time or place served with a summons in this action, and the affidavit of proof of service thereof, that I was on the 31st day of March, 1897, served with a summons in this action by William A. Sweetser, is absolutely false.   I reiterate that I was not at that nor any other time served with a summons in this action.   I do not know said William A. Sweetser, nor did he know me, personally or otherwise, at the time he swears he handed me the summons herein.   I have never seen or met him.   * * * I never knew of the pendency of this action, nor that suit was to be brought to trial, nor have I at any time ever been communicated with by said Mortimer A. Ruger, nor have I ever written him, nor he [to] me."   Dodge then swears that he has fully and fairly stated the case to his counsel, Abraham H. Hummel, and that his counsel had advised him that he has a good and substantial defense on the merits.   On this affidavit, which the defendant must have known to be false, as in the affidavit of the 8th of September Dodge had sworn that a copy of the judgment had been served upon him in 1898, Hummel applied for and obtained, from a justice of the Supreme Court, an order to show cause why the judgment of divorce should not be set aside.   Upon that motion coming on to be heard, a referee was appointed to take testimony, and the defendant appeared and took part in the proceeding before the referee on behalf of Dodge.   Dodge swore before the referee that he had not been served with the summons, and had not authorized an attorney to appear for him, and the testimony of the former Mrs. Dodge (now Mrs. Morse) and her attorney was also taken before the referee. The referee reported that the summons was not served upon the defendant, Dodge, in that action, and that Dodge had not authorized an attorney to appear for him.   Upon the referee's report, and after hearing Hummel as counsel for Dodge, on December 3, 1903, an order was entered confirming the referee's report, and vacating and setting aside the judgment of divorce, on the ground that the summons was never personally served on Dodge.

Subsequently to the entry of this order vacating the judgment of divorce, Charles W. Morse retained the firm of Guggenheimer, Untermyer & Marshall to advise him in respect to the matters in relation to his wife, and the effect of the order of December 3, 1903. The Mr. Ruger who had appeared as attorney for Dodge in the divorce proceedings was dead; but a search was made among his papers, when there was found a letter from Dodge to Ruger dated May 2, 1897, stating: That the summons which was inclosed had been served upon him by the plaintiff's attorney at the Everett Hotel in New York; that he would like Mr. Ruger to appear for him in the action; and that he had no defense to the action. And another letter to Mr. Ruger saying that he was in receipt of a letter from Mr. Ruger that he authorized Mr. Ruger to expedite the trial in every way possible and consent to anything and make no objection to a divorce. On these letters and the affidavit of Sweetser, who was plaintiff's attorney in the action for divorce, a motion was made to vacate the order setting aside the judgment. The whole matter was then exposed. There was no opposition offered to this motion, and the order of the Special Term entered on the 3d of December, 1903, vacating and setting aside the judgment of divorce in Dodge v. Dodge, was vacated, annulled, and set aside, and the judgment of divorce restored and reinstated in full force and effect as though such order had not been made.

Dodge was then indicted, and it would appear that an attempt was made to bring him to New York for trial. If Hummel had been imposed on by Dodge, or had acted in good faith in making the motion and obtaining the order vacating the judgment of divorce, he naturally would have been anxious to assist the public prosecutor in punishing Dodge. He was a member of the bar, owing that duty to the courts and to the public. On the 1st of February, 1904, however, Hummel called James T. Morse on the long distance telephone at Boston, and told Morse that Dodge had been arrested somewhere in the South on account of perjury; that they had fixed his bail at $10,000; and that he (Morse) ought to come over and attend to the same. Morse then got $10,000, came to New York, called on Hummel and gave him the $10,000, no part of which was ever returned to him. Subsequently, on the 24th of February, 1904, Hummel again called Morse up by telephone, told Morse he would need some more money, and asked for $3,000, which amount Morse took to Stamford, Conn., and there gave to Cohen, Hummel's clerk. Subsequently Hummel called for other sums of money, so that between the 1st of February, when the criminal proceedings had been commenced against Dodge, and the end of March, Hummel got out of Morse about $40,000 to protect Dodge from the criminal prosecution. No possible explanation is offered as to Hummel's conduct in obtaining this money from Morse. I can conceive of no explanation of this that is consistent with the defendant's innocence. If Hummel had obtained Dodge's presence here and used him for the purpose of upsetting this divorce by inducing him to commit perjury, it is quite apparent why Hummel should consider it essential to keep Dodge from being brought here for trial, for Hummel would then be in danger of just what has happened—Dodge turning State's evidence—in which case Hummel

would be in trouble. But I can conceive of no other reason which would induce Hummel and Morse to pay $40,000 to protect Dodge from prosecution for the crime of which he was clearly guilty. If there can be no doubt that the evidence, eliminating Dodge's testimony, required the jury to come to the conclusion that the defendant was guilty, certainly the undisputed facts, when taken in connection with Dodge's testimony, to which attention will now be called, establish beyond a doubt the guilt of the defendant.

Dodge testified that in March, 1897, he was in the city of New York, and was served with a summons in the divorce action at the Everett Hotel, on the 31st day of that month. He identified a copy of the summons that was served upon him which was produced, and he also identified the letters that he had written to Mr. Ruger, authorizing Ruger to appear for him in the action, and to do what was necessary, and with which had been inclosed the summons in the divorce action that had been served upon him. He testified further: That he has heard that the divorce had been obtained when he was at Tampa, Fla., in the spring of 1898, and in the summer of 1901, he learned of the marriage of his former wife to Charles W. Morse. That at no time, of his own motion, did he ever take any steps to question that marriage or the validity or regularity of his divorce. That when he was at Atlanta, Ga., fitting up a restaurant in the latter part of August, 1903, he received a telegram from one Bracken in New York, which he answered. That in consequence of that telegram he came to a place called "Gainesville," where he met Bracken. That Bracken told Dodge that he had been sent by Mr. Hummel to bring Dodge to New York to see Hummel. That he finally consented to go with Bracken for $500 in cash, which Bracken paid. Bracken and Dodge then came to New York, and, on the following day, the 7th of September, Bracken called on Dodge and took him to the defendant's office. That the defendant then told Dodge: "I sent Bracken to Atlanta for you to come up here on a little matter in which you may be able to help us," or words to that effect. That the defendant then made an appointment to meet Dodge on the following day. That on the following morning Dodge and Bracken again saw Hummel, and Hummel then asked Dodge various questions about his marriage and divorce, and asked if he had been served with papers at the hotel. Dodge at first told him "yes, at the Everett House on the last day of March, about that time, in the year 1897," but afterwards told him that he had not been served. Dodge also told him that he had a lawyer by the name of Ruger, and told defendant how Ruger came into the case; that he had written to Ruger at New York. A stenographer was then called up, when the defendant dictated the first affidavit to which attention has been called. After this affidavit was dictated, Dodge and Bracken went out to lunch, and at about 2 o'clock came back and saw Hummel again, and Dodge then signed and swore to the affidavit in defendant's presence. After signing and swearing to this affidavit, Dodge returned to Atlanta. On the 16th of October, 1903, Bracken again appeared in Atlanta, telling Dodge that he had come down to take him back to New York, and the result was that on the following day Bracken and Dodge started for New York. On

the morning after he arrived in New York Dodge went with Bracken to the defendant's office and saw the defendant. The defendant introduced him to his partner, Steinhardt, and then left. While there Steinhardt dictated the second affidavit which was used in making this motion to set aside and vacate the decree of divorce. After this affidavit was written out Dodge swore to it. In reading over this second affidavit, Dodge said to Steinhardt: "How about the letters to Ruger?" and Steinhardt said: "Ruger is dead; you will hear nothing from that." After this affidavit was signed Dodge saw the defendant again, when defendant said: "You are to get $5,000 for this;". and five $1,000 bills were given to Dodge. After Dodge obtained this money he put it in his pocket and went back to Atlanta. The next Dodge heard of the matter was on the 13th of November, when Bracken again came to Atlanta and accompanied Dodge back to New York. The day after he arrived Dodge was examined by the referee on the motion to vacate the judgment in the divorce case. He testified before the referee that he had never been served with the summons, and that he had never written to Ruger, and then returned to defendant's office, where Hummel gave him $500. He next saw Bracken in New Orleans on the morning of the 23d of January, 1904. On cross-examination Dodge swore that he told Bracken that he wanted $5,000 to come to New York the second time, and Bracken said he thought he could get it.

I think this testimony of Dodge can more reasonably be considered as confirming the inferences drawn from the other testimony than that Dodge's testimony was corroborated by the other evidence. The facts that the defendant, at the instance of a man who was not a party to, and had no relation to, or connection with, the action of Dodge v. Dodge, induced Dodge, a party to that action, to come to New York; prepared for him, and had him verify an affidavit that was false, and then as his attorney made an application to the Supreme Court upon this false affidavit and procured Dodge to testify to the falsehood, and upon this false testimony presented to and obtained from the court an order vacating a judgment, receiving from the third person who had instigated the proceeding the sum of $15,000, justifies the inference that this whole attack upon this judgment was a device invented by the defendant to upset this decree of divorce, in which scheme and device Dodge was a participant, actuated by a common purpose to make as much money out of those whose interests might be affected by upsetting or maintaining the judgment of divorce as was possible. Such being my conviction of the result of the testimony, and in view of section 542 of the Code of Criminal Procedure, little need be said in relation to the alleged errors in the judge's charge. In discussing these, it should be noted that the record presents no exceptions as to several of the refusals to charge relied on by the defendant, and, while we undoubtedly would be justified in reversing the judgment if we considered that injustice had been done, where we are satisfied that the conviction was the only reasonable and logical inference from the undisputed testimony, a ruling to which no exception is taken would hardly justify a reversal. But, we think, there was no substantial error committed by the trial judge.

The first error to which our attention is called is a claim that the trial judge charged as a matter of law that there was evidence which tended to corroborate Dodge, the accomplice. The learned trial judge in speaking of Dodge's testimony, said:

"He must be corroborated. That is, other evidence must tend to corroborate him, else there can be no conviction under the provisions of the Code. He must be corroborated by such other evidence as tends to connect the defendant with the commission of the crime. Now, as a matter of law, I charge you that there is other evidence which tends to corroborate him if you shall believe it to be true."

I think this instruction was correct. It was merely the result of the determination of the legal question which justified the court in refusing to advise the jury to acquit. The defendant could not be convicted upon Dodge's uncorroborated testimony, and if there was no testimony to corroborate Dodge's testimony, it was the duty of the learned trial judge to so instruct the jury. If, however, there was evidence that tended to corroborate the testimony of the accomplice in connecting the defendant with the commission of the crime it was the duty of the judge to leave the question to the jury; and, in doing so he necessarily was required to instruct them that they were justified in convicting the defendant if they found that the other evidence was true. The trial judge continued:

"Its truth is for you to determine, and not for me. But, if you find it to be true, then you may find that there was evidence tending to corroborate him. If you find it to be untrue, then he is without corroboration, and there can be no conviction."

And subsequently, at the request of the defendant, the learned judge charged the jury that Dodge could not, by affidavit, papers, or testimony corroborate Dodge, and that it was not sufficient to corroborate the accomplice as to facts generally, but he must be corroborated as to some material fact or facts which go to prove that the defendant was connected with the commission of the crime charged; that the corroboration of an accomplice by one or more accomplices is not such a corroboration as the statute requires; that even if an accomplice is corroborated the jury is still at liberty to reject his evidence. And the jury were then fully and specifically instructed as to the necessity of proving the defendant guilty beyond a reasonable doubt; that the question of fact was for the jury alone to determine and that they were not bound to accept the evidence of any witness which was in itself improbable, contradicted, or where the witness was impeached. I think there was no error committed, and that the charge was fully as favorable to the defendant as was justified.

The defendant also insists that it was error for the court to refuse to charge that:

"The crucial point in the case is whether or not Dodge said to Hummel at the first interview alone in his own room that he had not been served by process or authorized anyone to appear for him, and, unless that remark of Dodge to Hummel is corroborated, this jury must acquit the defendant."

Entertaining the view that we do, as to the effect of this evidence, leaving out of consideration Dodge's testimony, that refusal was clear-

ly correct.  The corroboration that is necessary is as to the connection of the defendant with the crime.   The fact that the defendant directly instigated the proceedings which terminated in the order vacating the judgment of divorce appears from all the evidence in the case, as well as from the records of the court in the proceeding in which the order was entered.   The fact that the court was imposed upon by the perjured testimony of Dodge is conclusively established, and, certainly, no one could believe that the defendant was innocently induced by Dodge's statements to accept his affidavit and testimony as true.   The court had before expressly charged upon the question of corroboration in the language of the statute, and it was for the jury to say from the whole evidence whether or not the defendant was guilty beyond a reasonable doubt.

The defendant also claims that error was committed by the refusal of the court to charge that the fact that the witnesses Kaffenburgh and Cohen declined to testify on the ground that their answers might tend to incriminate them, creates no presumption against them, and, in particular, none against the defendant.   In answer to that request, the learned trial judge stated that he declined to charge that in the language given.   Now, these two witnesses were called by the people, and not by the defendant.   They had not testified to any material fact, having refused to answer all material questions asked them, upon the ground that their answers might tend to incriminate them.   They were both connected in business with the defendant, and it was not part of the duty of the court to interfere for the protection of their characters. They testified to no fact that could in any way help the defendant, and while the defendant would have been entitled to an instruction that their refusal to answer questions should not prejudice him or create any presumption against him, the court was not bound to instruct the jury as to presumptions against the witnesses.   In consequence of this statement of the court, counsel for the defendant subsequently asked the court to charge that the "declination of Kaffenburgh and Cohen to answer does not in any way corroborate Dodge;" to which the court answered:   "Well, I assume that may be so.   But there is a query whether it is at all pertinent."   But, upon counsel for defendant repeating the request to charge "that the calling of Kaffenburgh and Cohen as witnesses, and the fact that they declined to answer and put themselves on their constitutional privilege, does not afford any corroboration of Dodge," the court replied:   "Yes—that I charge."

It is also claimed that it was error for the court to refuse to charge the jury that the determination of the defendant to call no witnesses and introduce no evidence created no presumption against him.   Nothing in this case justified such a request.   The jury were bound to consider that the testimony of the people was uncontradicted.   There were involved with the defendant in the acts complained of his partner and clerks.   I do not think it can be said that the jury were not justified in considering, in connection with the question of the truth of the evidence, that the defendant had failed to call his partner and clerks to testify as to the circumstances under which Dodge was brought back to New York and paid these large sums of money.   But there was nothing in the record that required the judge, as a matter of law, to.

tell the jury that they were not to consider the fact that none of these partners or clerks had been called by the defendant.

It was also alleged that the court erred in instructing the jury that the judgment roll in the case of Dodge v. Dodge showed that the marriage between Dodge and his wife was duly and legally dissolved. There is nothing in the record to show that that instruction was not correct. There is also a claim that the course of the district attorney in the examination of witnesses and his address to the jury was misconduct which requires us to reverse the judgment; but I do not think that anything that the district attorney said or did on the trial of the case requires the reversal of this judgment. There are other questions presented in regard to the rulings upon evidence and in relation to a juror, but they do not constitute error and require no comment.

Our conclusion, therefore, is that the evidence clearly justified the verdict, and that the judgment should be affirmed. All concur.

