PEOPLE, PLAINTIFF AND APPELLEE, *v.* MERCADO ET AL., DEFENDANTS AND APPELLANTS.

APPEAL from the District Court of Humacao in a Prosecution for Conspiracy.

No. 1070.—Decided February 4, 1918.

CONSPIRACY—EVIDENCE.—The acts and admissions of one conspirator are not binding upon another until a conspiracy and the connection of both therewith are established, but the conduct of either may be considered in so far as it tends to show the existence of a conspiracy or his own connection therewith.

ID.—ID.—SEPARATE ACTS BY DEFENDANT.—Separate acts by the defendants, yet tending to the same end, together with the relations of the doers to one another, and any other explanatory facts, constituting a body of circumstantial evidence, may be shown as justifying the jury in inferring a conspiracy whence they proceed. But, inferentially or otherwise, a connection between the acts must appear, or they will be inadequate. This sort of evidence may be given in the first instance to establish the conspiracy, or the combining may be made to appear by any competent testimony, and then the separate acts and declarations of the co-conspirators, including even persons not indicted, may be produced, for when this sort of relationship exists between persons, the doings of one are, in contemplation of law, those of all.

ID.—ID.—DOCUMENTARY EVIDENCE—TERMS OF DOCUMENT.—The fundamental notion of the rule requiring production of a document is that in writings the smallest variation in words may be of importance, and that such errors in regard to words and phrases are more likely to occur than error in regard to other features of a physical thing. Thus the rule applies only to the *terms of the document* and not to any *other facts about the document.* In other words, the rule applies to exclude testimony designed to establish the terms of the document and requires the document's production instead, but

does not apply to exclude testimony which concerns the document without aiming to establish its terms.

The facts are stated in the opinion.

*Messrs. Rafael Guillermety* and *Luis Muñoz Morales* for the appellant.

*Mr. Salvador Mestre, fiscal,* for the respondent.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Appellants were convicted of conspiracy upon an information charging that—

"The said Dr. Clemente Mercado and Juan Marcano Santiago, in Caguas, within the judicial district of Humacao, about September, 1914, illegally, voluntarily and maliciously conspired and combined to deceive and defraud 'El Ancora,' an insurance company against physical accidents, which is a corporation duly incorporated and authorized to do business in Porto Rico, and with such purpose the said Dr. Clemente Mercado, a practising physician, on or about September 1, 1914, examined one Fermín Martínez and certified that he was in possession of the functional and anatomic integrity of his extremities and that he was not suffering from any disease affecting his vision and that he was enjoying general good health, the said physician knowing that the said Martínez was in a very bad state of health and that he was suffering from tuberculosis; the said Martínez having been admitted as a subscriber in said company 'El Ancora' by virtue of the examination and certificate issued by Dr. Clemente Mercado, said acts having been performed in combination with Juan Marcano Santiago, for which the latter gave him a note for the sum of $200 and that said Marcano obtained an assignment in his favor of the insurance policy issued by the company 'El Ancora' to Fermín Martínez, who died a consumptive on December 26, 1914, the said Juan Marcano Santiago now claiming in a suit against said company before the District Court of Ponce the payment of the insurance policy amounting to about $967.05."

On behalf of Marcano it is urged that the court erred, first, in overruling a motion for acquittal made at the close of the Government's case for want of evidence sufficient to justify a conviction, and, second, in convicting defendants upon the uncorroborated testimony of an accomplice.

The brief for Mercado contains no specific assignment of error but proceeds along the same general lines, protesting also against the admission of oral testimony in regard to the note mentioned in the information.

The trial opened with an admission by the defense that the risk was accepted by the company in September, 1914, upon the examination and certificate of Mercado described in the information, and which contains an unused blank space for "Observations" intended to be filled in by the examining physician with mention of any minor ailment.

Martínez died in December and Marcano filed suit upon the policy as assignee of Martínez.

Rafael Rivera Dávila, local agent of the company in Caguas, who is the alleged accomplice, was the third witness for the prosecution and was permitted to testify before the other witnesses hereinafter mentioned were called, without any objection whatever either as to the order of proof or going to the admissibility of his testimony as a co-conspirator. Aside from any question of waiver in this regard and conceding, unnecessarily perhaps, for the sake of argument the alleged character of this testimony, we shall first refer briefly to the evidence *aliunde* tending to establish the fact of a conspiracy and to connect each of the defendants therewith as well as to corroborate incidentally the story of this witness.

Luis Mendín Sabat, an attorney, testified to a conversation in the office of Carlos B. Buitrago, another attorney, concerning a protest made to the company by the witness on behalf of the widow and sister of Martínez, assailing the validity of the assignment of the policy to Marcano, in the course of which Marcano stated that it was his business to insure people who were about to die in order to recover on the policy later; that he was not going to insure a person who had long to live, because he was not in that business; that his business was to insure one who was about to die. This witness also says that they were speaking of Martínez;

that José María Berríos was present; that these statements were not jocular, and that this occurred in January after the death of Martínez in December.

José María Berríos says that on this occasion they were discussing the matter of the policy issued to Fermín Martínez, and quotes Marcano as stating that he had made that deal because he was sure to collect his money soon, because he knew that the man was sick.

Luis Polo García knew Fermín Martínez ·for more than 23 years. They were born in the same town and raised in Caguas. Martínez, two years before his death, showed symptoms of illness, began to grow thin and had a certain hoarseness and a cough. In September, 1914, he was in bad health, hoarse, coughed much, expectorated, complained that he could not walk much because he tired. Dr. Mercado, discussing Martínez and his death, told witness that he had examined Martínez, had sent his sputum to San Juan and had received a negative report. Martínez, two years before his death, carried a peddler's basket, later began to fail and could not work but carried laces and ribbons on his arm. Before becoming a peddler of notions he was a barber and had a little *cafetín* in Caguas, later a store. Before the time of the shop he fell ill, expectorated, coughed, coughed much, said that he felt bad, was becoming emaciated, kept getting thinner, complained of pain in his chest. The shop was in Caguas in the same place where Marcano had his store. Martínez, three or four months before his death which occurred on December the 26th, was in a more serious condition, could not work, lifeless, weaker, more debilitated.

Carlos Delgado Fragoso, who also grew up with Martínez in the same street and was his neighbor during the last two years of his life, not only saw him often during August and September, 1914, but aided him. In Caguas he was regarded as a consumptive, at least at home, because they kept his things (*trastos*) separate, where he ate, and whenever he went out, wherever his saliva fell, urine and kero-

sene were thrown; that witness and Ventura Caraballo, a merchant alongside, did this, threw kerosene wherever he left his sputum; that this was done because he was a consumptive; that one day he came to witness with a paper asking assistance in order to purchase certain injections; witness inquired who had prescribed the injections and he said Dr. Mercado; witness read the paper which called for injections of *cacodilato de soda* and then witness went to Juan Mendoza and ordered the injections. One day shortly after this he said he was sick and wanted to enter the municipal hospital and witness took him to Dr. Buitrago who examined him (giving details of examination). He coughed much, he was very *fañoso,* hoarse. Two days after the death of Martínez witness saw Dr. Mercado on the street in front of the drug store of Juan Mendoza and asked him if Martínez was a member of the Ancora and Mercado answered: "Yes, he was the second member admitted and 29 days after his admission sold the policy to Juan Marcano"; that this statement was made on December the 28th after the death of Martínez. The defense elicited on cross-examination the further information that in September Martínez told this witness that Marcano had given him $20 which he gave to witness for safekeeping in two bills of $10 each, one of which was invested in notions, ribbons and laces and the other witness kept for a while and then returned it.

Dr. Buitrago testifies to the examination of a man unknown to him but presented by Delgado Fragoso and shown by other circumstances unnecessary to mention to have been Martínez, and gives as his conclusion that the man was unmistakably (*concluyentemente*) suffering from pulmonary tuberculosis.

Felipe B. Cordero Colón, another physician practicing in Caguas since 1911, attended Martínez as a charity patient in the municipal hospital, prescribed for him on different occasions up to the end of 1913, and after a careful study of the case diagnosed it as pulmonary tuberculosis. This

witnesses also saw Martínez afterwards on the streets peddling his wares, sometimes seated in a doorway, very weak, so much so that he used to carry notions, later he went about only with something on his arm, laces and such things, a very weak man. The last time witness saw Martínez was a month or two or three before his death and from the first to the last time witness saw him the disease was progressing in its natural course.

Carmen Martínez, a sister, says her brother was a sick man, feeble and always indisposed, always had fever and headaches and colds, but after being with Marcano in the *cafetín* he contracted an illness with much fever which never left him; he had it every day, coughing and spitting a great deal; he was with Marcano but a short while and this illness occurred about four months before he died. Witness attended him, and Dr. Mercado, who never came to the house but when her brother needed a prescription he went to Mercado at his office or at the hospital. The brother lived in the house of witness and died there (describing conditions of the last few days). He was thin and his ribs were bare. When he left the *cafetín* he set up a vegetable stand, but people would not buy from him because he was sick, and his bananas were rotting and he threw them on the garbage wagon and said to witness one day, "I must sell this stand because I am doing nothing." He had this stall two days because he had no business. Then he bought a stock of notions, but he had it only a few days because he could not attend to it. He would give the basket to a boy and follow the boy because he had no strength and could not cry his wares, so he sold it; it was a small outfit, not large. He was three or four days with the notions before he became seriously ill.

Lorenzo Rivera, merchant. had a *cafetín* in Caguas during the latter part of 1914, where Martínez used to come often; he was thin, had fever, said that he had fever, coughed and expectorated phlegm and was accustomed to ask for

water, and witness had a separate glass for him because
of his sickness. He coughed and expectorated frequently,
came slowly as if tired, fatigued, and would say, "I have
fever." Witness noted these symptoms for about a year
before the death of Martínez.

There was also some expert medical testimony based on
hypothetical questions tending to corroborate the diagnosis
of Doctors Buitrago and Cordero, although the primary
purpose of this testimony appears to have been to show the
difficulty of confusing a case of pulmonary consumption with
one of acute enteritis, thus anticipating the theory of the
defense, rather than to furnish cumulative evidence of what
seems to have been as well known to the laity as to the med-
ical men of Caguas.

To this we might add, were it necessary, the statement
of the agent that when he accepted the risk for transmission
to the company's headquarters he knew that the applicant
was more dead than alive, not as implicating the defendants,
but as an additional circumstance pointing to the existence
of a conspiracy and tending to support the theory of ap-
pellants that this witness was an accomplice.

The one incontrovertible fact overshadowing everything
else in the case is that Fermín Martínez, at the time of his
examination and admission to membership, was in the last
stages of pulmonary tuberculosis and that nothing short of
blindness could have deceived any person of ordinary intel-
ligence as to his condition. Insurance companies do not
knowingly accept such risks. No man in that condition,
without the assistance of others, could impose upon a com-
pany. Obviously, if we eliminate substitution, and in this
case there is no question of false impersonation, it would be
even more impossible for any other person, unaided and
alone, to accomplish the same result. It is hardly too much
to say that the mere acceptance of such a risk, in good faith,
without knowledge of its true character and by reason of a
false medical certificate forwarded through regular channels,

establishes a *prima facie* case of conspiracy and leaves open to investigation only the question of identity of the respective conspirators and of the part played by each, although, of course, the clearing up of these matters usually, if not necessarily, furnishes further evidence of the conspiracy itself. In any event the fact that a flagrant fraud was attempted is not open to argument.

Martínez did not operate alone, if he can be said to have participated at all, save as a mere instrument in the hands of others. The false certificate was an indispensable prerequisite to the issuance of the policy. Mercado unquestionably facilitated the attempted fraud, assuming that nothing more existed at this stage, and converted it into a conspiracy by deliberately certifying to a gross falsehood; for in so doing, and regardless of his motive, he necessarily and knowingly participated with another or others in a plan to defraud the company.

Martínez had been employed by Marcano and prior to such employment apparently had conducted a business of his own on the same premises. Caguas is a small town. Marcano must have known that Martínez was about to die. There are certain details, omitted in the interest of brevity from the testimony above quoted, which justify the conclusion that Martínez had no money to pay the fee of a medical examiner, or, conceding that this may have been waived, the price of admission, or the amount of the first premium. All the circumstances, with the single exception of the fact that he was the person insured, negative the idea that he conceived, or of his own initiative executed, any part of the plan, or had any interest in the matter beyond the two ten dollar bills or whatever else may have accrued to him as an immediate reward for lending himself to the purpose of his former employer and of the physician who wrote prescriptions for him. The policy when issued was promptly assigned to Marcano who, upon the death of Martínez, filed suit as such assignee. Marcano, shortly after the death of Martínez, prac-

tically admits, not that he bought the policy, but that he procured the insurance with a view to collecting on the policy. This may have been mere persiflage, or bitter sarcasm, but in the circumstances it was for him a most unfortunate remark, at least requiring explanation. In passing, and somewhat by way of anticipation, we may say that no such explanation is offered in the testimony for the defense, but instead the making of the statement is denied.

The acts and admissions of Marcano, of course, are not binding upon Mercado until a conspiracy and the connection of both therewith are established, and vice versa; but the conduct of either may be considered in so far as it tends to show the existence of a conspiracy or his own connection therewith.

"A third person's declarations—as, that he committed the crime in question—will not in the ordinary case be admitted for or against the defendant. * * * But on its being shown that one or more persons were acting in concert with the defendant about the thing in question, all with a common object, declarations during its progress, by any one of the others, whether present or absent, may be given in evidence against the defendant." 2 Bishop's New Criminal Procedure, p. 1067, § 648.

"Separate acts by the defendants, yet tending to the one end, together with the relations of the doers to one another, and any other explanatory facts, constituting a body of circumstantial evidence, may be shown as justifying the jury in inferring a conspiracy whence they proceeded. But, inferentially or otherwise, a connection between the acts must appear, or they will be inadequate. This sort of evidence may be given in the first instance to establish the conspiracy; or * * * the combining may be made to appear by any competent testimony, and then the separate acts and declarations of the co-conspirators, including even persons not indicted, may be produced, on the principle explained in the first volume. For when this sort of relationship exists between persons, the doings of one are in contemplation of law those of all." 3 Bishop's New Criminal Procedure, pp. 1370, 1371, §§ 227, 228.

See also: 12 C. J. 638, § 231; 5 R. C. L. 1066, § 37; *State v. Thompson,* 38 Atl. 868; *State v. Gannon,* 52 Atl. 727; *Os-*

*borne* v. *State,* 55 So. 52; *Commonwealth* v. *Smith,* 40 N. E. 189; *Commonwealth* v. *Hunton,* 46 N. E. 404; *Commonwealth* v. *Rogers,* 63 N. E. 421; *Commonwealth* v. *Riches,* 107 N. E. 371, 374; *Kelley* v. *People,* 55 N. Y. 565; *People* v. *Van Tassel,* 51 N. E. 274; *People* v. *Dunbar Contracting Co.,* 109 N. E. 554; *People* v. *Hummel,* 119 App. Div. 153; *People* v. *Miles,* 123 App. Div., 862; *U. S.* v. *Newton,* 52 Fed. 275; *Lehman* v. *U. S.,* 127 Fed. 41; *U. S.* v. *Cohan,* 128 Fed. 615; *Smith* v. *U. S.* 157 Fed. 721; *Alkon* v. *U. S.,* 163 Fed. 813; *U. S.* v. *Breese,* 173 Fed. 402; *Jones* v. *U. S.* 179 Fed. 584; *Ryan* v. *U. S.,* 216 Fed. 13; *Smith* v. *U. S.* 231 Fed. 25.

We do not deem it necessary to discuss the authorities cited by appellants as to this feature of the case. In so far as, through confusion of ideas, want of careful consideration, loose language, *obiter dicta,* improper application of other well-known rules *in pari materia,* or otherwise, the decisions so relied upon, as well as a few others to be found in certain jurisdictions, may be regarded as repudiating the rule above announced, as applied to the facts herein, the same are unsound in fundamental principle and in practice tend to obstruct rather than to facilitate the due administration of substantial justice.

If the prosecution had rested here without calling the alleged accomplice and if the motion for acquittal had been overruled, it is somewhat more than doubtful whether such action by the trial court would have amounted to reversible error. A rehearsal of this so-called accomplice testimony, except the portion that refers to the promissory note, would seem superfluous. To assert that it is "corroborated by other evidence which in itself and without the aid of the testimony of the accomplice tends to connect" both defendants "with the commission of the offense" is not so accurate as to say that it lends to the web of circumstance already woven about the defendants whatever additional strength, if any, is necessary to exclude "every other reasonable hypothesis save that of guilt."

According to this witness, after Marcano had applied for a policy on the life of his employee, presented the medical certificate subscribed by Mercado and paid the premium or fee of admission, and after the agent had seen the sick man sign the application, the following conversation occurred between witness and defendants:

" 'Doctor, have you seen Fermín Martínez?' And he said, 'Why?' 'Because he is dying on his feet.' And then he said, 'I have not seen him, I will see him to-day' and on the following day, or the day after, Dr. Mercado exhibited a note signed by Juan Marcano for the sum of $200, and said, 'Pass this risk and you will have a share in this matter.' Witness said, 'Do whatever you want; for my part I don't want anything.' It was a weakness of witness, but that occurred in that way, and that is the reason why witness is not seen in court, why he came to court. Before that * * * witness met Fermín Martínez one day on the street, in front of the house of Carlos Fragoso, coughing his soul out of his mouth; witness then saw Dr. Mercado and Mr. Marcano, and told them to pick up that man, that he was dying in the street, as they had a policy; that they were going to receive later the amount coming to Martínez on the insurance policy. As they were to receive the benefit that they should pick him up and have him in a safe place."

Then, after a narrative of other events including the death of Martínez, protest by other subscribers in Caguas against payment, investigation by the company and other offers and promises made by both defendants to witness, the record continues:

"That he does not know what became of the $200 note, he does not know what became of it; witness did not retain it; Dr. Mercado retained it. The *fiscal* puts the following question: 'What did the document say?' Witness answers that the note read: 'I promise to pay Mr. So-and-so, Dr. Mercado, the sum of two hundred dollars. * * * The defense objects. The court says that the witness has already testified and the court admits any evidence not objected to and presented by either of the parties. The prosecuting attorney asked how the document read and the defense made no objection to the question. It appeared as if the defense admitted that the document should not be introduced and the court cannot now sustain

a tardy objection when the defense knew the question perfectly and waited to make use of its right after it had been answered, in order to see whether or not the answer would be favorable to him.

"The defense alleges that on the other hand this witness had said that the document had remained in possession of Dr. Mercado. The *fiscal* could have asked the court for a *subpœna duces tecum.* And the court decides that the *fiscal* undoubtedly might have resorted to a *subpœna duces tecum,* but if the witness has been asked as to the recitals of the document, and at that time, which was the proper time to object, counsel did not object and waits until an answer is given to judge of its contents.   *   *   *

"The defense asks that it appear of record that he prays the court to strike out the question put by the *fiscal* and the part of the answer to said question given by the witness, because he understands that the proper proof is the paper itself, inasmuch as the Law of Evidence furnishes a means of bringing in Dr. Mercado with the paper through an order *duces tecum.*

"The court overrules the motion, because that question was put without objection by the defense and the court believes that a question having been made without objection, any right the other party might have to demand the introduction of the best evidence has been waived.

"The defense takes an exception to the ruling of the court.

"The witness goes on and testifies that he saw the paper. The *fiscal* puts the following question: 'By whom is it signed?' And the witness says: 'Signed, Juan Marcano.' The defense makes the same objection as before to the question put by the *fiscal* and to the answer, as it was made so rapidly that he had no time to make his objection before the witness could answer. The court decides, as it did before, that the defense having waived its right to require the best evidence to prove the contents of the document and that question being a consequence of the preceding one, the *fiscal* may put it.

"The defense takes an exception, inasmuch as the witness had not testified whether he had seen the signature or not. The *fiscal* says that he withdraws the question, because it was previously answered by the witness.

"The witness continues that the offer to which he referred before was made when Dr. Mercado presented himself to him with the above-mentioned paper, a promissory note in writing, and told him: 'Let this pass; I will give you a share in this matter,' and the witness left the paper with him; and regarding the matter of letting that pass or not, what he did was to let it pass; his fault, but he let it

pass; afterwards he could not stand it; it was a great burden for him, and one day he took his pen and wrote to the company, 'this has occurred:' that he let that pass as one of so many, as one of a number of softnesses of character, neither more nor less; one of so many softnesses of character.''

The reason assigned by the trial judge for his ruling and criticized by appellant Mercado in his brief is not so important as the ground upon which objection was made below. In the case at bar the authenticity of the signature, the amount named in the note and the exact terms and conditions thereof are negligible details. The significant feature of this testimony is that Mercado exhibited a writing, described by witness, in connection with the following statement and request: ''This matter is fixed up. I settled with Marcano and he gave me this document. Let that pass, and you will get your share in this note.''

''The fundamental notion of the rule requiring production is that in writings the smallest variation in words may be of importance, and that such errors in regard to words and phrases are more likely to occur than error in regard to other features of a physical thing. Thus the rule applies only to the *terms of the document*, and not to any *other facts* about the document. In other words, the rule applies to exclude testimony designed to establish the terms of the document; and requires the document's production instead, but does not apply to exclude testimony which concerns the document without aiming to establish its terms.'' II Wigmore on Evidence, secs. 1242 to 1256.

It is difficult to perceive what prejudice could have resulted to defendant from a refusal either to exclude or to strike a mere repetition of testimony already embodied in the record long before the time of this incident and to the admission of which no objection was ever made. No distinction was sought to be drawn between the two defendants in the court below and Marcano in his brief merely calls attention to the failure of the witness to give the date of the note as going to the weight of the testimony. In so far as the want of a previous *duces tecum* is concerned, at least

as. to the only defendant who insists upon this point, the information was sufficient notice to produce the document. II Wigmore, secs. 1192 to 1205; 2 Bishop's New Criminal Procedure, p. 448.

The judgment appealed from must be

*Affirmed.*

Chief Justice Hernández and Justices Wolf and del Toro concurred.

Mr. Justice Aldrey took no part in the decision of this case.

On March 5, 1918, a motion for reconsideration was overruled.