## UNITED STATES v. COHN et al.

(Circuit Court, S. D. New York. March 9, 1904.)

1. CONSPIRACY—QUALITY OF EVIDENCE—PARTNERSHIP WITH CONSPIRATOR.

Where, in a trial of a member of a firm for conspiracy to defraud the customs revenue, there was proof that his firm was concerned in such conspiracy, *held* that it is not mere partnership in the firm, nor relation to some acts, that the law required to be done in the course of passing goods through the custom house, that is demanded to show guilty connection with the conspiracy; it must inevitably appear that such connection was used, or such relation assumed, for the purposes of subserving the conspiracy.

2. REVENUE—CONSPIRACY TO DEFRAUD—NEW TRIAL—VERDICT CONTRARY TO EVIDENCE.

Where a verdict of guilty was rendered in a trial for conspiracy to defraud the United States of duty on imported merchandise against a member of a firm that was implicated in the conspiracy, *held* that the verdict was contrary to the evidence, and a new trial should be granted, where it appeared that the accused had been admitted to the firm within seven months of the time of the fraud; that during that time, and the previous time when he had been an employé of the firm, he had not been connected with the general management of the business, which was of large volume and international scope, requiring a systematic division of duties; that he had been engaged almost exclusively in selling the merchandise and designing patterns; and that there was no evidence that he had had any relation with a single fact in connection with the purchase of the merchandise or its importation, with the exception that he had signed in blank some of the entries of the merchandise, leaving the particulars of the entries to be filled in by the customs brokers, and no evidence that he had had occasion to examine into the business of the company, or that there had been an accounting during his membership in the firm.

3. CRIMINAL LAW—NEW TRIAL—CO-CONSPIRATORS.

Where parties have been indicted for conspiracy, tried together, and found guilty, the grant of a new trial to one of the accused does not require that a new trial should be granted to any co-conspirator.

4. SAME—LIABILITY OF PARTNER FOR CRIME OF COPARTNER.

A partner is not chargeable with criminal acts of his copartners or others, acting in behalf of the firm, unless he has knowledge thereof.

---

¶ 4. See Partnership, vol. 38, Cent. Dig. § 307.

**5.** CUSTOMS DUTIES—ENTRY—ILLEGAL DECLARATIONS—SIGNING IN BLANK—NOTARY PUBLIC—FALSE CERTIFICATION.

Under section 5, Customs Administrative Act June 10, 1890, c. 407, 26 Stat. 132 [U. S. Comp. St. 1901, p. 1889], providing that on the entry of imported merchandise the importer shall make certain sworn statements in regard to the importation, *held*, that the practice of having such declarations signed in blank by an importer, to be filled in later by a customs broker, and the practice of notaries public in falsely certifying such declarations as having been made and sworn to in their presence, are illegal, and to be condemned in law as in morals.

Henry L. Burnett, U. S. Atty., and W. Wickham Smith, Sp. Asst. U. S. Atty. Gen.

A. J. Dittenhoefer and Frank H. Platt, for Cohn.

De Lancey Nicoll, John D. Lindsay, and Judson G. Wells, for Browne.

THOMAS, District Judge. The indictment charges that "on and before the 30th day of July, 1901," Rosenthal, Cohn, Browne, and others to the jurors unknown, conspired to defraud the United States of duties that should be paid upon goods imported from foreign countries by Abraham S. Rosenthal and Martin L. Cohn, and that such conspiracy was to be effected by Rosenthal and Cohn causing the goods to be shipped from foreign countries, consigned to A. S. Rosenthal & Co., at the port of New York, upon consular invoices containing, and known to them to contain, false statements as to weight; and that they should make their written estimated entries at the custom house at the port of New York upon such invoices, whereupon Browne, the examiner in the appraiser's department, should neglect and refuse to ascertain the true weight and nature of such part of the said goods as should be designated and sent to the public stores for examination, and should knowingly make false returns and reports upon the invoices as to the weight and nature of the goods, to the end that the estimated entries and the duties upon the same should be liquidated by the collector upon such returns and reports, and less than the amounts of duty legally due thereon collected. The indictment charged five overt acts, three of which were entries made by Rosenthal and Cohn, and two of which were the passing of goods by Browne in the manner charged.

After numerous motions, demurrers, and pleas not involving the merits, the action was brought to trial on January 22d, pursuant to an order of the court made at a previous term, and, upon Rosenthal failing to appear, the trial was severed as to him, and the jury impaneled as to the other defendants. Some 4½ days were taken in the selection of a jury, and thereupon the trial continued to February 20th, when the jury rendered a verdict that Cohn and Browne were each guilty, and strongly recommended the former to the mercy of the court. Each defendant moved for a new trial, and after full discussion and consideration of the carefully prepared briefs of the parties it is concluded that a new trial should be granted to Cohn and denied to Browne. The evidence amply justified the finding of the jury that some persons, in behalf of A. S. Rosenthal & Co., for several months after about January 1, 1901, were importing goods and entering them

at this port upon false invoices, for the purpose of defrauding the government. Indeed, the evidence, marshaled with admirable painstaking and skill, and lucidly presented upon the trial by the government, amounted to a demonstration that could have left no properly equipped mind unconvinced that there was a fraudulent scheme formed by some persons. Had there been a single invoice showing a mere discrepancy between the weights as actually ascertained and as invoiced, the government might not accuse the importation as fraudulent; but the multiplicity of fraudulent invoices, showing repeated and startling discrepancies between the stated and actual weight of the goods, must have swept irresistibly the minds of the jurors to the conclusion that fraudulent practices for the purpose of defrauding the government were on foot, and that several persons connected with A. S. Rosenthal & Co. at this and foreign ports were involved. Indeed, specific written evidence was given that some person in New York, co-operating with A. S. Rosenthal & Co.'s agent at Lyons, arranged with Coles & Son, of London, that the latter should pack silks made in China, 200 pieces in a case, and, marking them "Made in Japan," deliver them for shipment to Pickford, forwarder at London, and that A. S. Rosenthal & Co.'s agents at Lyons should attend to the consulation. Such goods should have been invoiced and consulated at London, but it was contrived that the goods should be consulated at Lyons, France, upon invoices showing purchase of Godchaux & Co., of that place, of 50 pieces in case, of a weight largely below the actual weight, and at a price much less than the price actually paid; and so it was done. The goods were consulated at Lyons on or about March 18th, the entry blank was signed by Cohn and the entry thereupon made in New Nork on March 28th, and one case was examined and passed as correct by Browne on April 2d. Under this arrangement three other shipments of goods purchased of Coles & Son, upon invoices severally dated April 1st and 4th and May 11th, all showing similar frauds, were made, and upon due arrival at this port the goods were entered, Rosenthal in each instance signing and declaring upon the entries; but none of the last three shipments of fraudulent importations from London chanced to be sent to the public stores, nor did Browne examine them. The transactions connected with the purchases from Coles & Son, standing alone, unequivocally declare that some persons, in the interest of A. S. Rosenthal & Co., arranged a criminal scheme to defraud the government, and imported goods under and pursuant thereto, thereby depriving, on four shipments, the government of between $6,000 and $7,000. While the evidence of this fraudulent practice on the part of some persons has this irresistible probative force, yet the evidence disclosed the personnel of the guilty actors with varying degrees of persuasiveness. That certain persons, either holding the relation of partner or agent to the firm of A. S. Rosenthal & Co., were such guilty actors, admits of no doubt whatever. As to the defendants Cohn and Browne, a just statement is that the evidence does not warrant a conclusion, within the rule of reasonable doubt, that Cohn was a guilty actor in the fraudulent undertaking, while there is sufficient evidence to justify the finding of the jury that Browne, beyond a reasonable doubt, was involved in the ar-

rangement to commit the fraud. It may be that the evidence of Browne's guilt is not so irresistible as is the evidence that the fraudulent scheme existed, yet the evidence against Browne is sufficient to justify the verdict that he, without whom the conspiracy would be hopelessly ineffective, was a member of it. Browne, observing a right that belonged to him, was not a witness in his own behalf, and the state of the evidence was such that the jury was justified in finding that his acts and omissions, further unexplained, were inconsistent with his innocence, and were only compatible with the conclusion that he had betrayed the trust reposed in him as an examiner, for the purpose of aiding the conspiracy. It does not appear that there was error in the impaneling of the jury, in the admission or rejection of evidence, or in the charge of the court, demanding that a new trial should be granted.

It remains to point out with some particularity the reasons for the decision that the evidence concerning Cohn was insufficient to justify the verdict of guilty rendered against him. It is a delicate judicial function to supervise, and, if need be, set aside, the finding of a jury of such marked excellence in intelligence and unabated attention as the jurors in the case possessed and observed. But not even a proper concern for governmental interests, or the public welfare, or for a sturdy enforcement of the law, warrants the maintenance of a verdict that is unsupported by sufficient evidence of guilty connection with the crime charged. It is not a mere connection with the business of the importing firm involved, nor relation to some acts that the law required to be done in the course of passing goods through the custom house, that is demanded. Such connection must exist, and such relation of some person representing the importers in due course of business must arise, even if the importations were legitimate. It must inevitably appear that such connection was used, or such relation assumed, for the purpose of subserving the conspiracy.

What was Cohn's connection with the business of A. S. Rosenthal & Co., and with the transactions upon which the charge is predicated? What was the firm of A. S. Rosenthal & Co.? Who were the partners? What was and what had been Cohn's relations to the firm? What did he specifically do respecting the fraudulent invoices? What opportunity did he have to know of the same? What presumption of knowledge of the nature of such invoices existed, from which the jury could draw inferences unfavorable to him? The firm of A. S. Rosenthal & Co. was established in business in New York at some time before the year 1892, and was engaged in the purchase and sale of Japanese silks, handkerchiefs, lambrequins, table covers, and taffetas. The firm's name was changed in 1898 to that of A. S. Rosenthal & Freed, the latter having been for some years a partner. Cohn, who had previously been engaged in business in the far West as salesman for different houses' located there, came to New York in 1892, and after a time was employed by A. S. Rosenthal & Co. to sell goods in the city of New York. After two years he added to his duties of salesman the further care of creating or devising the styles or patterns of goods that should at times be shown in goods manufactured for the firm or purchased by it. For the first year he received a salary

of $6,000; for the second year he received a salary of $7,500; for the third year he received 6¼ per cent. of the profits, with a guaranty of $7,500, which in 1898 was increased to 15 per cent. of the profits, with a guaranty of $15,000. On January 1, 1901, Freed retired, and Cohn became a partner in the firm, putting in some capital, and entitled to receive 25 per cent. of the profits and $10,000 in salary in addition. In Yokohama the firm had a branch known as A. S. Rosenthal & Co., in charge of one Bramhall and J. H. Rosenthal, a cousin of A. S. Rosenthal, both of whom had an interest in the profits of the business. In Lyons, A. S. Rosenthal & Co. had an agent, Godchaux, while one Beechenor—for some 14 years so employed—attended to the buying of the goods in Europe, and received his compensation by sharing in the profits of the business. The firm both sold and bought goods in Europe, having accounts in Zurich, France, London, and Canada. This survey of the business indicates the range and complexity of its trading, whose volume is illustrated by the fact that in 1901 the business amounted to $3,750,000, that the foreign value of the merchandise imported was some $1,650,000, and the duty paid thereon was $868,000. The extent of the business of the firm has important bearing upon the question of Cohn's cognizance of the details of the firm's transactions, beginning, so far as this action is concerned, at the very inception of his joining it, and extending through some six or seven months thereafter. Into this large business of a long-established house, Cohn was introduced as a partner in January, 1901. Such a business necessarily demanded systematic division of duties, and the evidence uncontradictedly shows that Cohn was in the sales department; that he sold goods in the morning about the city of New York, and that in the afternoon he was in the salesroom, selling or attending to sales of goods on the floor, or, when not so engaged, that he designed goods in a small office taken off from such floor. It also appears that Rosenthal, Medd (an employé in the office), Cohn, and at some times Freeman, head salesman, made up the prices of goods to customers. As to this Cohn testified: "Q. What did you have to do with it? A. We would look at an article, and see what we thought it would bring, and put the price on accordingly. * * * Q. Did you know anything about the market for those goods abroad? A. No, sir; nothing to do with the market abroad." It further appears that in March the general office was moved to a floor above the salesroom, that Freed had been in immediate charge of it during his connection with the firm, that thereafter Rosenthal had charge of it, and under him Mr. Hill, an employé, to December, 1901, when he was succeeded by Mr. Medd. Cohn states that he did not have occasion to look over the invoices of goods, save that "once in a while I had occasion to refer to one to see what was coming in—some particular style we had orders for, and when we could promise the trade to deliver them to them." The goods came into the basement of the store, and were opened by the porters, and minor clerks checked them off from the assortment sheets, which showed the kind of goods, the number of pieces of the goods, and the lot number of the goods. These sheets were sent up to the office for comparison with the original invoices. Cohn states that he never checked off an assortment sheet

with the invoices in his life, nor was he present when this was done. It further appears that Rosenthal was in general charge of the business. That fact may be inferred properly, inasmuch as he had for a long period been the principal partner, and the person who contributed more largely to its capital. It cannot be doubted that he was the head of the house, the governing power, and the person in charge of its financial affairs. The evidence shows that Cohn, before August, 1901, never went to the custom house, except for the purpose of leaving his signature when he first became a partner; that he was never at the appraiser's department before July 30th, save on a single occasion, for a harmless errand; that he never visited the banks, save on a single occasion, to leave his signature; that he did not have charge of drawing checks; that he never paid the bills, nor saw them; that he never ordered the goods. All of that part of the business was in a separate department, with which he had no immediate connection. Nor is there the slightest evidence in the case that Cohn had any personal connection whatever with any of the transactions whereby the goods were brought to this country, nor is there any specific evidence that he had any immediate knowledge thereof. But upon the arrival of the goods in this country there is evidence connecting Cohn with particular acts with reference to the entry of certain invoices at the custom house, and with reference to certain transactions in the appraiser's department after such entry. Of all the invoices offered by the government 14 were passed by Browne, and the dates of these invoices range between December 21, 1900, and June 22, 1901, and the entries thereof in the custom house range between January 18, 1901, and July 15, 1901. Ten of these invoices were from Yokohama, and six of these ten entries were made by Cohn and four by Rosenthal. It seems fair to state that the goods falling under these ten invoices had gone into consumption before the conspiracy was discovered. Hence the government, for the purpose of showing the false weights described in these invoices, was obliged to rely upon such samples as had been selected from the total pieces of goods by Browne, to be sent to the analyst for his examination and report, and thereafter returned to the appraiser's department, where they remained after Browne had been suspended. Respecting this manner of ascertaining the weights of goods falling under such invoices, the learned counsel for the government stated in the final argument to the jury:

"We would have an absolutely perfect case against both Cohn and Browne if you strike every bit of that evidence out of the case. And, moreover, I say to you that if there were no other evidence against these men than that particularly, they never would have been prosecuted. That evidence—and I will proceed to discuss its value in a moment—that evidence is offered here as corroborative evidence to establish irresistibly the inference to be drawn from the other facts that have been proven against these people, from the English Coles shipments, from the kaiki invoices that were always underweighted, from the substituted invoices. These are the salient points of the evidence for the prosecution, and the so-called swatch (sample) testimony is introduced to corroborate the other testimony, and to strengthen the inferences to be derived from it."

The remaining invoice passed upon by Browne was dated March 18th, entry was made thereon March 28th, and was passed by Browne

on April 2d. The declaration to the entry was signed by Cohn. This invoice covered goods purchased in London, and, while fair on its face, it was in fact a narration of falsehoods, according to the evidence, whereby the government was defrauded of several thousand dollars. Browne was suspended from duty on July 30th, and the only other entries shown to have been made by Cohn before such suspension were three in number. One was on July 27th, upon an invoice from Yokohama, dated July 3d. An examination of the goods was made in the appraiser's department on October 19th, by J. D. Smith, who found a discrepancy in weight of 10½ pounds upon a total weight of 254¾ pounds, the duty on the deficiency being $43.35. Thereupon the balance of the cases in the shipment which had been delivered to the importers was asked for, but it was answered that the remaining cases had largely gone into consumption, with the exception of certain pieces, which were offered to the government, but were not accepted by it, as they were regarded as insufficient for the purposes of further examination. There were also two entries signed by Cohn, one on July 25th and the other on July 16th. The invoice covered by the entry first named was examined and the goods weighed in the first instance by Examiner Pringle, on July 29th, and returned as correct. A re-examination was had by Examiner Smith in August, on several occasions, and finally in Cohn's presence—a privilege obtained by Cohn after much difficulty, and only after application to the collector himself. A discrepancy in weight of 67 pounds was discovered. Cohn's energetic conduct respecting the investigation of this invoice has been characterized as self-serving, but it is equally consistent with the promptings of a person unconscious of an offense, and unwilling to credit its existence without ascertainments made before his own eyes. The other invoice entered by Cohn on July 16th, and passed by Smith on August 13th, covered goods from Yokohama. Smith reported that there were more pieces of goods than were mentioned in the invoice, and that there was a discrepancy in weight of 549 pounds, which would make a difference in duty of $423.40.

So much for entries made by Cohn before Browne's suspension on July 30th. The entries made thereafter are unimportant upon the question now under discussion, inasmuch as any entry made after Browne was suspended could not have been in furtherance of the conspiracy. The question now arises whether the mere fact that Cohn made such entries of itself is any evidence of his guilty connection with the fraudulent scheme. Had these entries been made by a partner in charge of the purchasing department, or if it had appeared that such partner had been connected with the importations—for instance, those from London—the fact of such person taking part in the entry would have been strong supplemental evidence of guilty participation in the conspiracy. But such conclusion would have found its necessary support in the earlier evidence of actual or presumed knowledge of the transactions with which the offenses' were connected. While the jury must have inferred that Rosenthal, Beechenor, Godchaux, or all of such persons, had such knowledge, yet there is no specific evidence as regards Cohn; nor does it appear that he was in a position where he would be likely to obtain such knowledge. Therefore the fact that

his name appears upon the entries is quite as consistent with his innocence as with his guilt. But when the circumstances under which he signed the entries are taken into consideration, there is no ground for holding that the mere fact of signing the entries showed that he was a participant in the fraud of which they were in fact a part. It was then, and is still, a practice of the firm of A. S. Rosenthal & Co. to have in its possession a number of entry blanks, issued by their custom house brokers, Corbett & Co., and it was the further practice, justly condemned, of A. S. Rosenthal's custom house clerk to take a number of these blanks to some member of the firm to secure his signature to them before they were filled up. Thereupon the clerk retained these blanks until it was desired to make an entry of goods, whereupon he sent the number of blanks needed to Corbett & Co., the custom house brokers, whose clerk filled in the entry on its face and back, and one Brautigan, a notary public, certified that the importer had made the declaration in his presence. The entry, thus filled in and certified, was presented at the custom house for the purpose of making the entry upon the invoice described in it. Counsel for the government urged that the mere fact that this objectionable practice was employed was in itself evidence of Cohn's connection with the conspiracy. While such practice is in disobedience of the statute, and is to be strongly condemned in law as in morals, it would not tend to convict Cohn upon an entirely distinct charge, although it might be used to affect his credibility as a witness. However much it might tend to discredit the evidence of Cohn as to any affirmative statement or negation made by him, the jury would have no right to infer that the opposite of his statement was true, unless there were other evidence upon which the jury might rely. Had the invoice been an honest one, representing an honest transaction, Cohn would have signed the declaration and have made the entry in precisely the same manner. But whether the entry was made upon a blank form, and without proper declaration before a notary public or other proper officer, or whether it was made in obedience to the statute in that regard, the mere fact that Cohn did what he did to enter the goods cannot, of itself, have any significance as showing his guilty participation in the conspiracy, without some evidence that he knew the nature of the invoice to which the entry related. Of this there is not the slightest evidence in the case, unless it may be found in the fact that he became a member of the firm of A. S. Rosenthal & Co. in 1901, and that from that connection alone it may be presumed that he knew the business of the firm, and was cognizant of the transactions represented by the invoices.

In this connection it must be observed that before these entries signed by Cohn were received in evidence, the counsel for the government and for the defendants had made the following stipulation:

"Counsel for the government admit that all such signatures to entries and declarations were placed on said paper in blank, and that said papers, so signed in blank, were sent to M. J. Corbett & Co.; that all the writing in said entries and declarations was placed afterwards thereon by George Brautigan, a clerk in M. J. Corbett & Co.'s office; and that none of said papers were seen by said Cohn, after signing them in blank, until more than a year after the said entries were made in the custom house, and that said Cohn had no knowledge how said papers were filled in by Brautigan."

This stipulation was in accordance with the fact as shown by the evidence, and the government lost no rights by making it, and thereby saved much time upon the trial. The stipulation merely represented the truth, and its value now is that it illustrates that the government recognized the fact as it existed, and made the stipulation accordingly.

The customs administrative act (section 5, Act June 10, 1890, c. 407, 26 Stat. 132 [U. S. Comp. St. 1901, p. 1889]) provides that the declarant shall state that he is "the owner of the merchandise described in the annexed entry and invoice," that the declaration shall describe the ship in which the importation was made, and that the declarant shall state "that the invoice and entry which I now produce contain a just and faithful account of the actual cost of the said goods," etc. This provision seems to make the invoice a part of the declaration, so as to bring it within the terms of the stipulation. Hence it must be accepted as a fact that Cohn did not know how the declaration was filled in, nor what invoice was attached to and made a part thereof. This deprives his act in signing the entry blank of any significance as bearing upon his complicity in the conspiracy. But assume that the blank had been filled, the invoice annexed, and Cohn had signed and duly declared before the proper officer. What would the act signify as showing his guilty connection with the conspiracy? He would be doing the precise thing which he would have a right to do, and which the law required him to do in the case of an honest importation. Hence, as already stated, the act of making the entries in itself counts for nothing. Nobody claims that an inspection of the invoices would discover the fraud without an examination of the goods to which they were related. Hence, unless Cohn had some antecedent knowledge of the fraudulent practices, he is not incriminated by his immediate connection with the entries.

Upon the motion for a new trial the learned counsel for the government is understood to have admitted orally that substantially the only evidence connecting Cohn with the conspiracy was to be found in the fact of his relation to the firm of A. S. Rosenthal & Co., and his duties in the business of such firm. While this seems to very much narrow the evidence against Cohn, yet, after a most careful consideration of the evidence, it is thought that counsel brought the discussion to the very essential and crucial point of the inquiry. The argument against Cohn may be stated as follows: Cohn was at the head of the selling department. He knew and aided in fixing the prices of goods. To do this he must have known the cost of the goods, and therefore he must have known the factors that entered into the cost, one of which was the duty paid upon them; and thereby learned, if he had not obtained notice or information from other sources, that there was a fraudulent scheme for depriving the government of its proper duties. Moreover, as a partner, he could not but have known of the large savings of duty and of disbursements to corrupt the examiners. It is a rule in criminal cases that a partner is not charged by the criminal acts of his copartners, or others acting in behalf of the firm, unless he has knowledge thereof. The law in relation to partnership is that the partner agrees to be bound for all acts done in obedience to the law, to which there are attached certain civil liabilities for

fraudulent acts or representations done or made by a partner or an agent for the purpose of affecting the firm's business. It is not considered that, in the absence of some special statute bearing upon the particular acts of a firm, whereby each partner is made the subject of punishment, one partner can be found guilty of a crime because his partner or agent has done acts that would justify his or their punishment. However, there would be a very strong presumption that, if a person were a member of a firm regularly carrying forward a business in course of which offenses were committed for the purpose of defrauding the revenue of the United States, he would become at some time cognizant thereof. For instance, if money were being paid to Browne for the purpose of obtaining his co-operation in the criminal scheme charged, it would not be presumed that Rosenthal, if he were the guilty actor, would make the arrangement, and himself alone bear the disbursement, but that he would exact contribution from Cohn and his other partners, or those interested in the profits. Even if the books of the company did not show such disbursements, yet no one would infer that they would be lost sight of in the yearly adjustment between the partners. So, also, if several cases of silks were ordered in London, and there was, through a fraud practiced on the revenue, a difference in duty amounting to between $6,000 and $7,000, it would be a reasonable presumption that at some time a partner not first concerned in the arrangement looking to this saving would become cognizant thereof. But it must be kept in mind that Cohn was a younger man, who had entered the firm on January 1, 1901, and that he had been a part of the firm less than six months when the conspiracy was rendered ineffective. There is no evidence that during that time he had had occasion to examine into the business of the company, nor from a knowledge of the manner in which business is conducted is there any inference that he did make an examination of the books, or that there was any settlement between the partners. Had there been such settlement, or had a year expired, after which such settlements are usually made, it would be difficult to infer that a partner, who was vigilant in securing his full share of the profits, would take such statement as his partner saw fit to make of the receipts and disbursements, or that he would remain unfamiliar with the manner of conducting the business, by which large sums of money were saved by fraudulent practices. Taking into consideration the large extent of the business, its widespread transactions, the practically supreme power which Rosenthal exercised over it, the necessary division of the business into departments, the absorption of Cohn in a department so totally divorced and unrelated to matters that would give him notice of the transactions in the office or of the fraudulent importations, the fact that he was a new member of the firm, and had been such for only six months, and presumably had not yet had his first accounting with Rosenthal, it is thought that a verdict that he must have been conscious of the existing frauds and the favorable results to the firm was not justifiable.

So far as fixing prices is concerned, the evidence shows that Rosenthal, and the men immediately under him in charge of the office, the head salesman, and Cohn, participated, taking into consideration, among other things, undoubtedly, the prices for which the goods would

sell in the market, concerning which Cohn's opinion would be of the utmost value. While it may be properly assumed that the cost of the goods would enter into the prices fixed, it is not to be inferred that the cost price was diminished by the amount saved through fraudulent importation. It is not to be presumed that the fraudulent scheme was conceived and enacted for the purpose of aiding the consumer; and, if there is to be any presumption, it is that the cost of the goods were made up in the office, and were either marked upon the goods, or communicated to Cohn, or both, without entering into a discussion of the effect upon the cost price on account of the fraudulently diminished duties. While, therefore, all this class of evidence might create suspicion of knowledge on the part of Cohn, of which he availed himself as a member of the firm, or while it might carry some moral conviction, it appears to the court, looking at it as strictly legal evidence, that it is not sufficient to connect Cohn with the conspiracy, so that it can be said beyond a reasonable doubt that he was guilty.

The government also gives evidence of certain acts of Cohn after the 30th day of July, when the conspiracy became practically ineffective. Before that time, on the 16th or 17th of July, he had been to the appraiser's department for the first time, and then only for the purpose of finding whether certain goods which, contrary to the rule, had been delivered to A. S. Rosenthal & Co. for consumption, must be returned to the appraiser's department, or might be released. The defendants' counsel urges that, inasmuch as he refused to allow the goods to be opened or used before the full rules of the custom house had been complied with, it showed a fidelity on his part tending to acquit him of any indirection; while the government contends that there was some error in the shipment unfavorable to the firm, entirely disconnected with the conspiracy, that showed that he had a selfish purpose in having the goods sent back to the appraiser's department. But, whatever his motive, it was plainly not a guilty one, and has no significance in that regard.

After the 30th day of July there were certain goods afloat, shipped from Yokohama, and on August 15th these goods were reconsulated upon substituted invoices, whereon entries were made at this port between October 17th and 29th, by Cohn, in the manner above stated. It is contended that the reconsulation of these goods after the conspiracy was discovered shows an attempt to conceal the misrepresentation of weight in the original invoices, and that this in some way affects Cohn. There is not the slightest evidence that he had any connection with the substitution of these invoices, and, even if he had, it would be quite consistent with integrity that an honest partner, having discovered a fraud, should insist, as far as possible, that the fraudulent invoices be not used, but that invoices, so far as possible correcting the false invoices, be substituted in place thereof, and that the custom house authorities should be informed that additions should be made for weight and value. The same may be said of the Lyons substitutes. These entries were all made and passed through the custom house after October 17th, and it would be more than unreasonable to presume that Cohn, or any other person, was attempting to defraud the government at that late date. The most that can be claimed for these

subsequent actions is that they showed an effort to make right something that had been done wrong, either for the purpose of preventing detection or saving the goods from seizure. The evidence shows that Cohn had no specific connection with a single act, fact, or circumstance relating to the purchase, invoicing, shipping, or importation of the goods into this country; that after their arrival his sole relation to them was that he made entries in the manner above stated of certain of the goods; that his brief connection with the firm of A. S. Rosenthal & Co., and relative duties in connection with its business, do not justify an inference that he had obtained knowledge of the fraud. Hence it must be concluded that there is not sufficient evidence to support the verdict as to him. The court has had opportunity to consider the evidence denied to the jury, and after the most assiduous study of the record has reached the conclusions stated.

Upon the authority of Regina v. Gompertz, 6 Pa. Law J. 377, Commonwealth v. McGowan, 2 Pars. Eq. Cas. 341, and Dutcher v. State, 16 Neb. 30, 19 N. W. 612, it is urged by counsel for Browne that a new trial for Cohn must result in a new trial for Browne. These cases, do not seem in point. Cohn is granted a new trial because no cause of action was proved against him, and the indictment should have been dismissed as to him by the court. Had such dismissal been ordered, nevertheless Browne's case could have been submitted to the jury.