EL PUEBLO, DEMANDANTE Y APELADO, *v.* MERCADO ET AL.;
ACUSADOS Y APELANTES.

APELACIÓN procedente de la Corte de Distrito de Humacao
en causa por delito de conspiración.

No. 1070.—Resuelto en febrero 4, 1918.[1]

CONSPIRACIÓN—ACTOS Y ADMISIONES DE UN CONSPIRADOR EN CUANTO A OTROS.—
Los actos y admisiones de un conspirador no obligan a otro hasta tanto se
establezca la existencia de una conspiración y la conexión de ambos con la
misma; pero la conducta de cualquiera de ambos puede ser considerada, en
tanto cuanto tienda a mostrar la existencia de una conspiración o su propia
conexión con la misma.

ID.—ACTOS AISLADOS DE LOS ACUSADOS.—Actos aislados de los acusados, pero
tendentes al mismo fin, junto con las relaciones que tuviesen uno y otro de
los que lo cometieron, y cualquier otro hecho explicativo que constituya
un cuerpo de pruebas circunstanciales, pueden probarse porque justificarían
deducir la conspiración de que son productos. Pero por inferencia o de otro
modo, debe aparecer alguna conexión entre los actos, o de lo contrario serían
inadecuados. Esta clase de prueba puede darse en primer lugar para esta-
blecer una conspiración; o la combinación puede hacerse aparecer por cual-
quier testimonio competente, y entonces los actos aislados y las declaracio-
nes de los co-conspiradores incluyendo aún personas no acusadas, puede ser
producida en evidencia, porque cuando esta clase de relación existe entre
varias personas, las actuaciones de una se considerarán a los ojos de la ley
como las de todos.

PRUEBA DOCUMENTAL—TÉRMINOS DEL DOCUMENTO—OTROS HECHOS RELATIVOS AL
MISMO.—La noción fundamental de la regla que requiere la presentación de
un documento consiste en que en un escrito la más mínima variación de pa-
labras puede ser de importancia, y que es más fácil que ocurran errores de
esta naturaleza en cuanto a frases y palabras que errores respecto a otros
pormenores de un objeto físico. Así pues, la regla es de aplicación sola-
mente en cuanto a *los términos en que se halla redactado el documento,* y no
en cuanto a *cualesquiera otros hechos relativos al mismo.* En otras palabras,
la regla es de aplicación cuando se pide la eliminación de testimonios que
tratan de ser introducidos con el propósito de establecer los términos en que
se halla redactado el documento, y exige en su lugar que se produzca el do-
cumento, pero no es de aplicación cuando se desea la eliminación de testi-
monios que se relacionan con el documento sin tratarse de establecer los
términos en que está concebido.

Los hechos están expresados en la opinión.

Abogados de los apelantes: *Sres. Rafael Guillermety* y
*Luis Muñoz Morales.*

Abogado del apelado: *Sr. Salvador Mestre, Fiscal.*

---

[1] En marzo 5 denegada reconsideración.

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

Los apelantes fueron convictos de un delito de conspiración a virtud de acusación formulada por el fiscal porque—

"Los citados Dr. Clemente Mercado y Juan Marcano Santiago, en Caguas, que pertenece al Distrito Judicial de Humacao, allá para el mes de septiembre de 1914, ilegal, voluntaria y maliciosamente conspiraron y se pusieron de acuerdo para engañar y defraudar a la Compañía contra accidentes físicos "El Ancora," corporación debidamente incorporada y autorizada para hacer negocios en Puerto Rico, y con tal objeto, el citado Dr. Clemente Mercado médico en el ejercicio de su profesión, allá para el primero de septiembre de 1914 reconoció a un tal Fermín Martínez y certificó que poseía la integridad anatómica y funcional de sus extremidades y que no padecía de afecciones de la vista y gozaba de buena salud general, sabiendo dicho médico que el citado Martínez estaba en muy mal estado de salud y que padecía de tuberculosis, habiendo sido admitido como suscritor en dicha Compañía 'El Ancora' el citado Martínez en virtud del examen y certificación expedida por el Dr. Clemente Mercado, habiendo efectuado estos actos de acuerdo con Juan Marcano Santiago, para lo cual éste le expidió un pagaré de $200 y el citado Marcano se hizo ceder a su favor la póliza de seguro expedida por la Compañía El Ancora, al Fermín Martínez, el cual falleció tuberculoso el día 26 de diciembre de 1914, reclamando actualmente el citado Juan Marcano Santiago, por la vía judicial ante la Corte de Distrito de Ponce, a dicha compañía el pago del importe del aseguro ascendente a unos $967.05."

En favor de Marcano se ha alegado que la corte erró, primero, al declarar sin lugar una moción pidiendo la absolución perentoria del acusado presentada al terminarse la prueba del Fiscal por falta de prueba suficiente que justificase una convicción por el delito imputado, y segundo, al declarar convictos a los acusados basándose en el testimonio no corroborado de un cómplice.

En el alegato en favor de Mercado no se han especificado errores contra la sentencia, pero sigue el mismo curso en términos generales protestando también contra la admisión

de prueba oral respecto del pagaré que se menciona en la acusación.

El juicio se abrió con una admisión que hiciera la defensa de que el riesgo fué aceptado por la compañía en septiembre de 1914, a virtud del examen y certificado expedido por Mercado y que se describe en la acusación, en el que se contiene un espacio en blanco para "Observaciones," el cual no ha sido utilizado y destinado para ser llenado por el médico examinador quien debía mencionar cualquier dolencia de menor importancia.

Martínez falleció en diciembre y Marcano entabló pleito para el cobro de la póliza como cesionario de Martínez.

Rafael Rivera Dávila, agente local de la compañía en Caguas, presunto cómplice, fué el tercer testigo llamado a declarar por el Fiscal y a quien se le permitió declarar antes que los testigos que más adelante se mencionan, sin objeción alguna, ora en cuanto al orden de la prueba, ora respecto de la admisibilidad de su declaración como co-conspirador. Aparte de cualquier cuestión sobre renuncia del pretendido derecho en este sentido, y admitiendo quizás innecesariamente, para los fines de la argumentación, el pretenso carácter de este testimonio, en primer lugar nos referiremos brevemente a la prueba *aliunde* tendente a establecer el hecho de una conspiración y de conectar a cada uno de los acusados con ella así como en cuanto ésto corrobora incidentalmente la versión de este testigo.

El abogado Luis Mendín Sabat, declaró sobre una conversación que tuvo lugar en la oficina del abogado Carlos D. Buitrago, respecto a una protesta que hiciera ante la corte el testigo a nombre y representación de la viuda y hermana de Martínez, impugnando la validez de la cesión de la póliza a Marcano, en el curso de la cual manifestó Marcano que su negocio era asegurar a personas que estuviesen a punto de morir con el fin de cobrar después la póliza; que él no iba a asegurar a una persona que pudiera vivir mucho tiempo, porque ese no era su negocio; que su negocio era asegurar

a aquellas personas que estuviesen a punto de morir.  Este testigo dice también que se estaba hablando precisamente de Martínez, que estaba allí José María Berríos, que esas manifestaciones no fueron hechas en sentido jocoso, y que ésto ocurrió en enero después de la muerte de Martínez ocurrida en diciembre.

José María Berríos, declara que en esta ocasión se discutía la cuestión de la póliza expedida a favor de Fermín Martínez, y cita palabras de Marcano que exponen que él había hecho ese negocio porque tenía la seguridad de cobrar su dinero pronto, porque sabía que ese hombre estaba enfermo.

Luis Polo García, dijo que conoció a Fermín Martínez por más de 25 años.  Que nacieron en el mismo pueblo y se criaron en Caguas.  Que Fermín Martínez como dos años con anterioridad a su muerte ya presentaba síntomas de enfermedad, que empezó a adelgazar, se le sentía cierto roncar y una tos.  Que allá por el mes de septiembre de 1914 estaba mal de salud, estaba ronco, tosía mucho, expectoraba y se quejaba de que era un hombre que no podía andar mucho porque se cansaba.  El Dr. Mercado, discutiendo sobre la muerte de Martínez, le dijo al testigo que había examinado a Martínez, que había enviado sus esputos a San Juan y que había recibido un informe negativo.  Martínez, dos años antes de su muerte llevaba una canasta de quincallero, después fué decayendo y no podía trabajar pero llevaba encajes y cintas en los brazos.  Antes de hacerse quincallero tenía el oficio de barbero y tenía un pequeño cafetín en Caguas y después una tienda.  Que antes de tener la tienda él se sentía enfermo, expectoraba, tosía, tosía mucho, dijo que se sentía malo, se veía que estaba demacrado, siguió adelgazando y se quejaba de dolores en el pecho.  Que la tienda la tenía en Caguas en el mismo sitio donde Marcano tenía su tienda.  Martínez 3 o 4 meses antes de su muerte ocurrida en 26 de diciembre estaba más grave, no podía trabajar, ya no había vida, el hombre estaba más débil, más decaído.

Carlos Delgado Fragoso también se crió con Martínez en la misma calle y fué vecino suyo durante los dos últimos años de su vida. No solamente lo veía amenudo durante agosto y septiembre de 1914, sino que lo ayudaba. En Caguas se le consideraba como tísico, al menos en su casa, porque le tenían sus trastos separados, donde comía y cuando salía donde quiera que caía la saliva le echaban orín y gas; que el testigo y Ventura Caraballo un comerciante del lado, hacían ésto, echaban gas donde quiera que dejaba un esputo; que eso lo hacía porque estaba tuberculoso; que un día vino al testigo con un papel pidiéndole que le ayudara a comprar ciertas inyecciones; el declarante le preguntó que quién le había recetado esas inyecciones y le dijo que el Dr. Mercado; el declarante leyó el papel y eran inyecciones de cacodilato de soda y entonces el declarante fué a casa de Juan Mendoza y le mandó a despachar las inyecciones. Luego, al poco tiempo, un día le dijo que se encontraba mal, y que quería ingresar en el hospital municipal y el declarante le llevó al Dr. Buitrago, quien lo examinó (dando los detalles del examen.) El tosía mucho, estaba muy fañoso, ronco. Que dos días después de la muerte de Martínez el declarante vió al Sr. Mercado en la calle frente a la botica de Juan Mendoza y le preguntó si Martínez era socio del Ancora y que Mercado le contestó: ''Sí, fué el segundo socio que ingresó en el Ancora y a los 29 días de ingresado le vendió la póliza a Juan Marcano;'' Que esta manifestación fué hecha en diciembre 28, después de la muerte de Martínez. La defensa sacó a luz en la repregunta la información adicional de que en septiembre Martínez le dijo al declarante que Marcano le había dado 20 pesos que él le dió al testigo a guardar en dos billetes de diez pesos cada uno, uno de los cuales lo invirtió en quincalla, cintas y encajes, el otro lo guardó hasta que se lo entregó.

El Dr. Buitrago declaró haber reconocido un hombre para él desconocido, pero que le fué presentado por Delgado Fragoso y que se demostró por otras circunstancias que no es

preciso manifestar, que era el propio Martínez y expuso su
conclusióu de que el individuo estaba concluyentemente su-
friendo de tuberculosis pulmonar.

Felipe B. Cordero Colón, otro médico en ejercicio en Ca-
guas desde el 1911 asistió a Martínez como paciente insol-
vente en el hospital municipal, le recetó en distintas ocasio-
nes hasta fines del 1913, y después de hacer un estudio cuida-
doso del caso lo diagnosticó de tuberculosis pulmonar.   Este
testigo vió también a Martínez después en las calles llevando
sus quincallas, algunas veces sentado en la puerta de alguna
casa, muy débil, tanto que acostumbraba a andar con una
quincalla, y últimamente no andaba nada más que con algo
en los brazos, algunos encajes y cosas así; que era un hombre
muy débil.   Que la última vez que el declarante vió a Martí-
nez fué un mes, o dos o tres antes de su muerte, y desde la
primera hasta la última vez el declarante vió que su enfer-
medad iba progresando en su curso natural.

La testigo Carmen Martínez, una hermana de Fermín,
declara que su hermano era un hombre muy débil, siempre
achacoso, siempre tenía fiebre y dolores de cabeza y resfria-
dos, pero después de estar con Marcano en el cafetín contrajo
una enfermedad con mucha más fiebre la cual nunca le dejó;
la tenía todos los días, tosiendo y escupiendo muchísimo, que
estuvo con Marcano pero por poco tiempo y que esta enfer-
medad ocurrió como cuatro meses antes de morir.   Que la
declarante le asistió y el Dr. Mercado que nunca vino a la
casa sino que cuando su hermano necesitaba algunas recetas
iba a la oficina de Mercado o al hospital.   El hermano vivía
en la casa de la declarante y murió allí (describiendo las
condiciones de sus últimos días).   Que su hermano era fla-
quito y los huesos del pecho pelados.   Que cuando salió del
cafetín puso un ventorrillo de verduras, pero que la gente
no le compraba, porque estaba enfermo y los guineos ama-
rillos se le podrían y los botaba al otro día al carro de la
basura y le dijo un día: ''Yo tengo que vender este vento-
rrillo porque yo no hago nada.''   Que ese ventorrillo estuvo

en poder de él dos días, porque no hacía negocio ninguno. Que después compró una quincalla, pero la tuvo pocos días porque no podía atenderla. Que le ponía la canasta al muchacho y se iba detrás del muchacho porque sus fuerzas no le daban y no podía cantar la quincalla, pues por eso la vendió; era una quincalla pequeña, no era grande. Que antes de caer enfermo grave estaría 3 o 4 días con la quincalla.

Lorenzo Rivera, comerciante, tenía un cafetín en Caguas durante la última parte del año 1914 donde Martínez acostumbraba a venir a menudo, que él estaba delgado, tenía fiebre, dijo que tenía fiebre, tosía y expectoraba flema, y acostumbraba a pedir agua, el declarante tenía una pieza separada para él por su enfermedad. Que tosía y expectoraba frecuentemente. Venía despacio como si estuviese cansado o fatigado y decía: "Tengo fiebre." El declarante notó estos síntomas como por espacio de un año con anterioridad a la muerte de Martínez.

También se presentó alguna prueba médico-pericial basada en preguntas hipotéticas tendentes a corroborar el diagnóstico de los doctores Buitrago y Cordero, aunque el fin principal de estos testimonios parece haber sido con el objeto de demostrar la dificultad que existe en confundir un caso de tisis con uno de enteritis aguda, anticipando así la teoría de la defensa mas bien que para suministrar pruebas acumulativas de lo que parece haber sido muy generalmente conocido tanto de los profanos como de los médicos de Caguas.

A esto pudiéramos añadir, si fuera necesario, la manifestación del agente de que cuando él aceptó el riesgo para su transmisión a las oficinas de la compañía, él sabía que el solicitante estaba más muerto que vivo no como para inculpar a los acusados, sino como una circunstancia adicional que señala la existencia de una conspiración y que tiende a sostener la teoría de los apelantes de que este testigo era un cómplice.

El hecho incontrovertible que encubre todo lo demás en el caso es de que Fermín Martínez, a la fecha de ser recono-

cido y admilido como socio, estaba en el último grado de la
tuberculosis pulmonar y que solamente estando ciego podría
una persona de ordinaria inteligencia engañarse, en cuanto
a su estado de salud.  Las compañías aseguradoras no acep-
tan a sabiendas tales riesgos.

Ningún hombre en ese estado sin la ayuda de terceros
pudo haber engañado a una compañía.  Es obvio que, si se
eliminase la teoría de la substitución, pues en este caso no
existe cuestión alguna sobre sustitución de personas, sería
aún más imposible para cualquiera otra persona, sin ayuda
de tercero y por sí sola obtener el mismo resultado.  Apenas
es demasiado decir si se dice que la mera aceptación de un
riesgo semejante, de buena fe, sin conocimiento de su ver-
dadero carácter y por razón de una certificación médica falsa
transmitida por los medios regulares estableciera un caso
*prima facie* de conspiración y deja abierta a investigación
solamente la cuestión de la identidad de los conspiradores
respectivos y de la participación que en ella tuvo cada cual,
aunque por supuesto, el esclarecimiento de estas cuestiones
por lo general, si no necesariamente, suministra ulteriores
evidencias de la conspiración misma.  En todo caso el hecho
de que se intente cometer un fraude flagrante no está abierto
a la argumentación.

Martínez no actuó sólo, si es que puede decirse de que
tomara participación alguna salvo como un mero instrumento
en manos de los otros.  El falso certificado era un requisi-
to previo indispensable a fin de que pudiera expedirse la
póliza.  Indudablemente que Mercado facilitó el frustrado
fraude, suponiendo que nada más existía a esta época, y lo
convirtió en una conspiración por certificar deliberadamente
una patente falsedad; pues que al hacerlo así, sin tener en
cuenta sus motivos, él necesariamente y a sabiendas parti-
cipó con otro u otros en el plan concebido para defraudar
a la compañía.

Martínez había sido empleado por Marcano y antes de
ocupar tal empleo aparentemente había llevado un negocio

suyo propio en el mismo sitio.    Caguas es un pueblo pequeño.
Marcano debió haber sabido que Martínez estaba a punto de
morir.    Hay ciertos detalles omitidos en interés a la breve-
dad que aparecen del testimonio antes citado, que justifican
la conclusión de que Martínez no tenía dinero para pagar los
honorarios del reconocimiento médico, o admitiendo de que
nada se hubiera cobrado por este concepto, carecía del dinero
para pagar el importe de su ingreso, o el montante del pri-
mer premio.    Todas las circunstancias, con la única excep-
ción del hecho de que él era la persona asegurada, contradi-
cen la idea de que él concibió o ejecutó a su propia iniciativa
cualquier parte del plan, o que tenía algún interés en el
asunto más allá de los dos billetes de diez pesos o cualquier
otra cosa que le hubiera dado como regalo inmediato para
prestarse a sí mismo a los propósitos de su anterior principal
y los del médico que le dió las recetas.

La póliza después de expedida fué prontamente cedida a
Marcano, quien una vez muerto Martínez entabló pleito en
su carácter de cesionario.    Marcano poco después de la
muerte de Martínez prácticamente admite no de que él com-
pró la póliza sino de que él procuró el seguro con la idea
de cobrar la póliza.    Esto puede haber sido mera filfa
(*perciflage*), o acre sarcasmo, pero dadas las circunstancias,
para él fué la menos afortunada de las observaciones, que
por lo menos exigía explicación.    De paso y algo así como
por vía de anticipación, podemos decir que semejante expli-
cación no fué ofrecida en la prueba de descargo; sino que
en su lugar se negó que se hicieran tales manifestaciones.

Por supuesto los actos y admisiones de Marcano no obli-
gan a Mercado hasta tanto se establezca la existencia de una
conspiración y la conexión de ambos con la misma, o vice-
versa; pero la conducta de cualquiera de ambos puede ser
considerada, en tanto cuanto tienda a mostrar la existencia
de una conspiración o su propia conexión con la misma.

''La declaración de una tercera persona como por ejemplo cuando
dice que él cometió el delito en cuestión no será admitida por lo ge-

neral en favor o en contra del acusado   *   *   *.   Pero si se demostrare que una o más personas actuaban de acuerdo con el acusado sobre la cosa en cuestión, todos con un objeto común, las manifestaciones hechas durante su curso por cualquiera de las otras, ya esté presente o ausente pueden admitirse como prueba en contra del acusado.''

2 Bishop's New Criminal Procedure, página 1067, párrafo 648.

''Actos aislados de los acusados, pero tendentes al mismo fin, junto con las relaciones que tuviesen uno y otro de lo que lo cometieron, y cualquier otro hecho explicativo, que constituye un cuerpo de pruebas circunstanciales, pueden probarse porque justificarían al jurado deducir la conspiración de que son productos.   Pero por inferencia o de otro modo, debe aparecer alguna conexión entre los actos, o de lo contrario serían inadecuados.''

''Esta clase de prueba puede darse en primer lugar para establecer una conspiración; o   *   *   *   la combinación puede hacerse aparecer por cualquier testimonio competente, y entonces los actos aislados y las declaraciones de los co-conspiradores incluyendo aún personas no acusadas, puede ser producida en evidencia, de acuerdo con el principio expuesto en el tomo I.   Porque cuando esta clase de relación existe entre varias personas, las actuaciones de una se considerarán a los ojos de la ley como las de todos.''

3 Bishop's New Criminal Procedure, págs. 1370, 1371, párrafos 227, 228.   Véanse también: 12 C. J. 638, párrafo 231; 5 R. C. L. 1066, párrafo 37; *State* v. *Thompson,* 38 At. 868; *State* v. *Gannon,* 52 At. 727; *Osborne* v. *State,* 55 So. 52; *Commonwealth* v. *Smith,* 40 N. E. 189; *Commonwealth* v. *Hunton,* 46 N. E. 404; *Commonwealth* v. *Rogers,* 63 N. E. 421; *Commonwealth* v. *Riches,* 107 N. E. 371, 374; *Kelley* v. *People,* 55 N. Y. 565; *People* v. *Van Tassel,* 51 N. E. 274; *People* v. *Dunbar Contracting Co.,* 109 N. E. 554; *People* v. *Hummel,* 119 App. Div. R. N. Y. 153; *People* v. *Miles,* 123 App. Div. R. N. Y. 862; *U. S.* v. *Newton,* 52 F. R. 275; *Lehman* v. *U. S.,* 127 F. 41; *U. S.* v. *Cohn,* 128 F. 615; *Smith* v. *U. S.* 157 F. 721; *Alkon* v. *U. S.* 163 F. 813; *U. S. v. Breese,* 173 F. 402; *Jones*

v. *U. S.* 179 F. 584; *Ryan* v. *U. S.,* 216 F. 13; *Smith* v. *U. S.,* 231 F. 25.

No creemos necesario discutir las autoridades citadas por los apelantes en cuanto a esta faz del caso. En todo cuanto por confusión de ideas, falta de detenida consideración, términos imprecisos, *obiter dicta,* indebida aplicación de otras bien conocidas reglas *in pari materia,* o de otro modo, las decisiones en que se han apoyado los apelantes, así como algunas otras pocas que pueden encontrarse en ciertas jurisdicciones, pueden estimarse como que repudian la regla arriba enunciada según se aplica a los hechos de este caso, las mismas no son sanas en principio fundamental y en la práctica tienden a obstruir más bien que a facilitar la debida administración de la substancial justicia.

Si el Fiscal hubiera parado aquí sin llamar al supuesto cómplice, y si la moción pidiendo la absolución de los acusados hubiera sido desestimada, es algo más que dudoso si semejante actuación de la corte habría constituído un error de los que dan motivo a la revocación de una sentencia. El reproducir el testimonio de este así llamado cómplice, excepto la parte que se refiere al pagaré, sería supérfluo. El afirmar que está "corroborado por otra prueba que en sí mismo y sin la ayuda del testimonio del cómplice tiende a conectar" a ambos acusados "con la comisión del delito" no es tan exacto como decir que presta a la red de circunstancias ya entretejidas en derredor de los acusados cualquiera que fuera la fuerza adicional, caso de que la hubiere, sea necesario excluir "toda otra hipótesis razonable que no sea la de la culpabilidad de los acusados."

De acuerdo con este testigo después que Marcano hizo su solicitud sobre la vida de su dependiente presentó el certificado médico, suscrito por Mercado y pagó el premio u honorarios de admisión y después de que el agente había visto firmar al enfermo la solicitud, tuvo lugar la siguiente conversación entre el testigo y los acusados:

"'Dr., usted ha visto a Fermín Martínez' y dice él, ¿por qué?— 'porque se está muriendo parado.' Y dice entonces: 'Yo no lo he visto, hoy voy a verlo, y al día siguiente o al otro día, le presenta el Dr. Mercado, un pagaré suscrito por Juan Marcano, por valor de doscientos pesos, y le dice: 'deje pasar el ingreso éste, que Ud. tendrá participación en este asunto.' Dijo el declarante: 'Hagan lo que quieran por mi parte yo no quiero nada.' Fué una debilidad de él, pero eso pasó así, y por eso se ve aquí, que vino a la corte. Antes de eso * * * un día, se encontró a Fermín Martínez en la calle, frente a la casa de don Carlos Fragoso, echando el alma por la boca; el declarante vió entonces al Doctor Mercado y el señor Marcano, y les dijo: que recogieran al hombre aquel que estaba muriéndose en la calle, supuesto que tenía una póliza, que iban a coger después la cantidad que le correspondía en el seguro. Ya que ellos eran los que iban a recibir el beneficio, que lo recojan y lo tengan en un sitio seguro.''

Entonces, después de una narrativa de otros acontecimientos, incluyendo la muerte de Martínez, la protesta presentada por los suscriptores en Caguas en contra del pago, la investigación hecha por la compañía y las ofertas y promesas hechas por ambos acusados al testigo, del récord aparece:—

"que no sabe donde iría a parar el documento de doscientos pesos, que no sabe donde fué a parar, el declarante no se quedó con él, quien se quedó con él fué el Dr. Mercado. El Fiscal hace la siguiente pregunta: '¿Cómo decía el documento?' el testigo contesta que el documento decía: 'pagaré a don fuláno de tal, Dr. Mercado, la cantidad de doscientos pesos * * *'. La defensa se opone. La corte dice que ya el testigo ha contestado y la corte admite cualquier evidencia que no sea objeto de oposición, y que sea presentada por cualquiera de las partes. El Fiscal preguntó qué decía ese documento, y la defensa no se opuso a la pregunta. Parecía como que la defensa aceptaba que no se introdujera el documento, y la corte no puede sostener ahora una oposición tardía cuando la defensa conocía perfectamente la pregunta y que espera hacer uso de su derecho a oponerse una vez que se ha respondido, para ver si le conviene o no le conviene la respuesta.

"La defensa alega que por otra parte ese testigo ha dicho que el documento ha quedado en poder del Dr. Mercado. El Fiscal ha

podido solicitar de la corte una orden *duces tecum*. Y la corte resuelve que indudablemente, el Fiscal tiene el medio de una orden *duces tecum,* pero si se ha preguntado al testigo sobre qué era lo que decía ese documento, y en ese momento que era el momento para oponerse, su Señoría no lo hace y espera la contestación para juzgar de su contenido.

"La defensa alega que hace consignar en el récord que solicita de la corte se sirva ordenar la eliminación de la pregunta que ha hecho el Fiscal, y la parte de la contestación de esa pregunta, que ha dado el testigo, por entender que la forma en que debe probarse sería con el documento mismo, toda vez que la Ley de Evidencia le da un medio para poder traer al Dr. Mercado con el documento por medio de una orden *duces tecum.*

"La corte declara sin lugar la moción, porque esa pregunta fué hecha sin oposición por parte de la defensa, y la corte entiende que una vez hecha una pregunta y no media oposición, queda renunciado cualquier derecho que tuviera la parte para solicitar la introducción de una mejor evidencia.

"La defensa toma excepción de la resolución de la corte.

"Sigue declarando el testigo que vió el documento. El Fiscal hace la siguiente pregunta: '¿Por quién está firmado?' y el testigo contesta: 'Firmado, Juan Marcano.' La defensa, igual objeción de eliminación a la pregunta del Fiscal y á la contestación, ha sido tan rápida que no ha tenido tiempo para hacerlo antes de que el testigo contestara. La corte resuelve como resolvió anteriormente, que habiendo renunciado la defensa a que se probara el contenido del documento por la mejor prueba, y siendo esa pregunta una consecuencia de la anterior, el Fiscal puede hacerla.

"La defensa toma excepción, toda vez que el testigo no había declarado si había visto la firma o no. El Fiscal dice que retira la pregunta, porque ya está contestada por el testigo anteriormente.

"Sigue declarando el testigo que la oferta a que se refería anteriormente se la hicieron cuando al declarante se le presentó el Dr. Mercado con el documento ese, un pagaré manuscrito y le dijo: 'deje pasar esto que yo le daré participación de este asunto,' y el declarante le dejó el documento; y con respecto de dejar pasar o no eso, lo que hizo fué que lo dejó pasar, una falta de él, pero lo dejó pasar, después no le cabía, era mucha carga para él, y un día cogió la pluma y dijo a la compañía, 'esto ha pasado'; que dejó pasar eso por una de tantas, una de tantas blanduras de carácter, ni más ni menos, una de tantas blanduras de carácter."

La razón que da el juez sentenciador para su decisión y que Mercado en su alegato critica, no es tan importante como el fundamento sobre el que se hizo oposición en la corte inferior. En el caso que nos ocupa, la identidad de la firma, el montante mencionado en el pagaré y los términos exactos y condiciones del mismo son detalles insignificantes. La parte de alguna significación, que existe en este testimonio es la de que Mercado exhibió un documento descrito por el testigo, en conexión con la siguiente manifestación y súplica: "Este asunto está arreglado, yo arreglé con Marcano y me dió este documento, deje pasar esto que Ud. tendrá participación en este pagaré."

"La noción fundamental de la regla que requiere la presentación de un documento consiste en que en un escrito la más mínima variación de palabras puede ser de importancia, y que es más fácil que ocurran errores de esta naturaleza en cuanto a frases y palabras que errores respecto a otros pormenores de un objeto físico. Así pues, la regla es de aplicación solamente en cuanto a *los términos en que se halla redactado el documento,* y no en cuanto a *cualesquiera otros hechos relativos* al mismo. En otras palabras, la regla es de aplicación cuando se pide la eliminación de testimonios que tratan de ser introducidos con el propósito de establecer los términos en que se halla redactado el documento, y exige en su lugar que se produzca el documento, pero no es de aplicación cuando se desea la eliminación de testimonios que se relacionan con el documento sin tratarse de establecer los términos en que está concebido." Il Wigmore on Evidence, secciones 1242 al 1256.

Es difícil percibir el perjuicio que podría traerle al acusado el rehusar la exclusión o eliminación de una mera repetición de prueba mucho antes del tiempo en que este incidente tuvo lugar, ya envuelto en el récord y a la admisión de la cual jamás se hizo objeción alguna. No trató de hacerse distinción alguna entre los dos acusados en la corte inferior, y Marcano en su alegato meramente llama la atención a la falta del testigo en decir la fecha del pagaré como si tratara de impugnar el peso de la prueba. En cuanto se refiere a la falta de una orden *duces tecum* previa cuando

menos en cuanto al único acusado que insiste sobre este punto, diremos que la acusación constituía una notificación suficiente para que se produjese el documento. II Wigmore, secciones 1192 al 1205. 2 Bishop's New Criminal Procedure, p. 448.

La sentencia apelada debe ser confirmada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf y del Toro.

El Juez Asociado Sr. Aldrey no intervino en la resolución de este caso.